2017 UT App 78

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ERIC MATTHEW RAY,
Appellant.

Opinion
No. 20121040-CA
Filed May 4, 2017

Fourth District Court, Provo Department
The Honorable Lynn W. Davis
No. 101401511

Margaret P. Lindsay and Douglas J. Thompson,
Attorneys for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
STEPHEN L. ROTH and JILL M. POHLMAN concurred.

ORME, Judge:

¶1     Eric Matthew Ray, then twenty-eight years old, engaged in a wholly inappropriate relationship with a fifteen-year-old girl (Victim). Growing out of that relationship, Ray was charged with several sexual offenses and, after a jury trial, was found guilty of forcible sexual abuse, a second degree felony. *See* Utah Code Ann. § 76-5-404(2)(a) (LexisNexis 2012). He was acquitted of a charge of object rape, and the jury could not reach a verdict on two counts of forcible sodomy. Because trial counsel provided Ray ineffective assistance by failing to request a jury instruction explicating the legal meaning of a key phrase within the elements instruction for the crime of which he was convicted, we reverse and remand for a new trial.

BACKGROUND

¶2     This case began innocently enough when Ray, then a law student in Illinois, inadvertently sent a text message to a wrong number. Victim, with whom he was not then acquainted, was the recipient of that text. Following this initial contact, Ray and Victim began an ill-advised relationship through continued (and frequent) text messages. Their relationship progressed, and eventually both parties affirmed their love for each other and their ultimate desire to wed. Ray decided to visit Utah to meet Victim during his spring break.

¶3     The pair met in front of Victim's school, and Ray drove her to his hotel, where they spent a considerable amount of time together over the next several days. On the first day, Ray kissed Victim, "and then there was a lot of kissing and making out going on." According to Victim, the "making out" involved intense kissing, with Ray touching her breasts and pubic area over her clothing. This went on for several hours.

¶4     The following day, the activities grew more sexual in nature. In particular, Ray and Victim again kissed on the bed, but this time they wore only their underwear. According to Victim, Ray "momentarily" touched under her bra and the front and back of her "private area" over her underwear. Victim testified that she touched Ray's "private area" over his underwear and gave him a "hand-job."

¶5     Two days later, Ray again took Victim to his hotel room, which he had decorated with flower petals and some thirty candles. Among other activities, Victim showered in Ray's hotel bathroom, shaved her pubic area (per Ray's earlier request via text message), and then exited the bathroom, naked, to find Ray, also naked. They kissed, standing together nude, before moving to Ray's bed where they continued kissing in the nude. Although they never engaged in vaginal intercourse, Victim testified that Ray touched the *outside* of her vagina. This testimony was contrary to what the prosecution told the jury to expect in its

opening statement, namely that Victim would testify that Ray digitally (and painfully) penetrated her vagina.[1] Afterward, they watched a movie together while still naked.

¶6     After going out for lunch at a nearby fast-food restaurant, they returned, undressed again, and kissed some more. According to Victim, Ray asked her if she wanted to have intercourse with him, but Victim said she "wasn't ready." Victim also testified that Ray then discussed with her how far he thought they could go "without getting in trouble with the law." That day, the last day of their tryst, Ray gave Victim "a candle, a tee shirt, and a vibrator" to remember him by, and Victim gave Ray a shirt.

¶7     Shortly after Ray returned to Illinois, Victim became severely ill with meningitis and was hospitalized. During her hospitalization, Victim's parents discovered her apparent involvement with a much older man, but they initially believed the relationship was limited to communication via the internet. After making this discovery, Victim's parents sent a message to Ray telling him to "leave [Victim] alone." They also contacted a family friend, who was a police detective, about the matter.

¶8     The detective visited the hospital and interviewed Victim. Victim, though "groggy" and heavily sedated, told the detective about her and Ray kissing and his having attempted to touch her vagina, but she did not then claim that any other sexual contact occurred. The detective continued his investigation, taking Victim's phone and assuming her identity in text-message and Facebook conversations with Ray. During the course of these conversations, Ray confided in "Victim" that he had deleted many of the photos Victim had sent him because he was afraid

---

1. The prosecutor's misstatement appears not to have been calculated, but rather a function of unexpected turns in Victim's testimony.

"the police were coming after [him]," even though he was sure his conduct had "not violated any laws."

¶9    When "Victim" asked Ray via text message why he was so afraid of her "telling on [him]," Ray texted back that "it would cause unnecessary complications in my life."[2] "Victim" wondered whether she might be pregnant, but Ray affirmed, "[W]e didnt have sex." After "Victim" responded, "yeah but you touched me there what if sperm was on your hand," Ray only replied, "your parents would have found a way to get me arrested." Ray did note, however, that "we wanted to [have sex] when we were kissing," "but you wanted to . . . stay a virgin and I didnt want to hurt you."

¶10    In an effort to lure Ray into making a more incriminating statement, the detective, still posing as Victim, feigned forgetfulness about the time they spent together. Ray confirmed key details of Victim's account, such as kissing her, the candles and rose petals in the hotel room, watching the movie together, kissing in bed "for the rest of the day," and visiting the fast-food restaurant with Victim. But he steadfastly refused to admit any conduct establishing the crimes for which he was later charged.

¶11    Eventually, "Victim" succeeded in persuading Ray to return to Utah. Before Ray left Illinois, he corroborated yet another detail: he asked "Victim" whether she still possessed the vibrator he had given her. Ray was arrested upon his arrival in Utah. Although it is true, as Ray states in his brief, that he "did not confess to or acknowledge[] any of the charged offenses" during his interrogation by police, he did confirm that the pair started their relationship through text messages, and he professed his deep feelings for Victim "numerous times and vigorously, vehemently." He was charged with two counts of

---

2. One such complication, no doubt, was that Ray was married at the time.

forcible sodomy,[3] one count of object rape, and one count of forcible sexual abuse. The case proceeded to trial.

¶12 During trial, Ray's counsel exposed a number of inconsistencies in Victim's story, including significant variation among the versions of her story as told to the detective during her initial interview, as discussed with her father and sister, during her preliminary hearing testimony, and as given in the course of her trial testimony. For example, Victim failed to testify that Ray digitally penetrated her vagina, which, as noted above, the State said she would do during its opening statement. Defense counsel also pointed out that Victim had denied on other occasions that Ray's penis entered her mouth, including during the preliminary hearing[4] and in a discussion with her sister, before she testified during her direct examination at trial that it did enter her mouth.

---

3. Although Victim denied at various times that she and Ray had oral sex, at one point during the preliminary hearing Victim alleged that she performed oral sex on Ray, and he on her, and that he ejaculated into her mouth. But a few minutes later, she denied that his penis actually entered her mouth. At trial, her testimony was that his mouth touched her vagina and that she touched his "private area" with her mouth for "[m]aybe 10 minutes." Of course, her prior inconsistency was consistently emphasized by defense counsel.

4. Victim's testimony during the preliminary hearing was somewhat contradictory; during examination by the prosecutor, she testified that Ray ejaculated in her mouth, but during cross-examination she testified, in response to defense counsel's question, "Was his penis ever inside your mouth?," "No. It might have touched [it.]" The magistrate likely concluded, in deciding to bind Ray over for trial on the sodomy charges, that one version of Victim's admittedly confusing account of events would support the charges, although clearly the jury would have credibility issues to sort out.

¶13 At trial, the detective recounted his conversation with Victim while she was hospitalized, described his trickery of Ray, and laid the foundation for the introduction of Ray's text messages to Victim's phone while the detective was pretending to be Victim. Victim's mother and Ray's (by then) ex-wife also testified against him. Ray did not take the stand.

¶14 Despite Ray's counsel's otherwise vigorous and effective defense, he neglected to ask for a jury instruction defining "indecent liberties" as that phrase is used in the forcible sexual abuse statute. *See* Utah Code Ann. § 76-5-404(1) (LexisNexis 2012). After deliberation, the jury returned a verdict of not guilty on the charge of object rape and guilty as to forcible sexual abuse. It could not reach a verdict on the two forcible sodomy charges. The trial court sentenced Ray to one-to-fifteen years in prison on the sexual abuse charge. Ray appeals.

ISSUE AND STANDARD OF REVIEW

¶15 Ray alleges that, by failing to request a jury instruction defining the term "indecent liberties," his trial counsel provided him ineffective assistance. Ray raises this claim for the first time on appeal. Although, ordinarily, "to preserve an issue for appeal, the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue," *State v. Soules*, 2012 UT App 238, ¶ 9, 286 P.3d 25 (citation and internal quotation marks omitted), "[i]neffective assistance . . . is an exception to the preservation rule," *State v. Johnson*, 2015 UT App 312, ¶ 15, 365 P.3d 730, because it is unrealistic to expect that trial counsel would bring his own ineffectiveness to the attention of the trial court. When such claims are raised for the first time on appeal, we treat them as presenting "a matter of law." *State v. Maestas*, 1999 UT 32, ¶ 20, 984 P.2d 376. "To win reversal on ineffective-assistance grounds, a defendant must prove both that counsel's performance was objectively deficient and that it resulted in prejudice." *Johnson*, 2015 UT App 312, ¶ 15.

ANALYSIS

I. Trial Counsel's Performance Was Objectively Deficient.

¶16   To begin, we state two basic points that guide our analysis. First, it has long been recognized that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application" is unconstitutional. *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926). The only thing capable of saving vague phrases—phrases such as "indecent liberties"—from constitutional infirmity is a clear and consistent meaning that has been engrafted onto the statute via judicial decisions. *See State v. Lewis*, 2014 UT App 241, ¶ 11, 337 P.3d 1053. And second, "[t]he general rule for jury instructions is that an accurate instruction upon the basic elements of an offense is essential. Failure to so instruct constitutes reversible error." *State v. Bird*, 2015 UT 7, ¶ 14, 345 P.3d 1141 (citation and internal quotation marks omitted).

¶17   The Utah Code states that

> [a] person commits forcible sexual abuse if the victim is 14 years of age or older and, under circumstances not amounting to rape, object rape, sodomy, or attempted rape or sodomy, the actor touches the anus, buttocks, or any part of the genitals of another, or touches the breast of a female, or otherwise takes indecent liberties with another . . . .

Utah Code Ann. § 76-5-404(1) (LexisNexis 2012) (emphasis added). We have previously made clear that the emphasized phrase is so vague as to be unconstitutional when it is not accompanied with further instruction as to its precise legal definition, which is considerably narrower than what it might be taken to mean in common parlance. *See Lewis*, 2014 UT App 241, ¶¶ 11–13, 15. Although the average juror is presumed capable of

interpreting terms with universally accepted definitions, *see State v. Day*, 572 P.2d 703, 705 (Utah 1977), to go further and "say that men unlearned in the science of the law are competent at all times . . . to determine the technical legal bearing and proper construction of an act . . . is something this Court cannot concede," *People v. Green*, 1 Utah 11, 15 (1876). Thus, we explained in *Lewis* that "indecent liberties" is a phrase that passes constitutional muster only if it is taken to refer to conduct on par with the specific, enumerated acts mentioned in the statute. *See* 2014 UT App 241, ¶ 15.

> Without this important narrowing of the term, a juror might reasonably assume that this catch-all phrase covered actions that are less serious than the specifically prohibited conduct—including actions that are merely socially or morally reprehensible or that strike us, subjectively, as being indecent in the sense of being totally inappropriate.

*Id.*

¶18 And so we arrive at ineffective assistance. "To prove that counsel's performance was deficient, a claimant 'must show that counsel's representation fell below an objective standard of reasonableness'" as "evaluated 'under prevailing professional norms.'" *Landry v. State*, 2016 UT App 164, ¶ 25, 380 P.3d 25 (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). Although we "'indulge a strong presumption'" of "'reasonable professional assistance,'" if the claimant demonstrates "there is no way that counsel's actions 'might be considered sound trial strategy'" then the presumption is overcome. *Id.* (quoting *Strickland*, 466 U.S. at 689).

¶19 Neglecting to provide an instruction as to the meaning of "indecent liberties" amounted to a failure to instruct the jury as to all the essential elements of the offense, because without this knowledge the jury would not know what sort of conduct

constituted "indecent liberties" in the legal sense. *See Lewis*, 2014 UT App 241, ¶ 15. The definition of "indecent liberties"— "activities of the same magnitude of gravity as [those] specifically described in the statute," i.e., "touching the vagina, anus, buttocks, or breasts"—is as much an element of the offense of forcible sexual abuse as the enumerated acts. *Id.* ¶ 11 (citation and internal quotation marks omitted). And just as failure to instruct the jury as to the elements of the charged offense would constitute reversible error, *see Bird*, 2015 UT 7, ¶ 14, in the context of the case before us, the failure to request an instruction explaining the element of "indecent liberties" constitutes objectively unreasonable assistance by counsel, *see Lewis*, 2014 UT App 241, ¶¶ 10–13.

¶20   As we see it, defense counsel had two basic options consistent with his duty to render effective assistance. Either he could have requested an instruction defining "indecent liberties," *see, e.g.*, Model Utah Jury Instructions 2d CR1601 (Advisory Comm. on Criminal Jury Instructions 2014), http://www.utcourts.gov/resources/muji/ [https://perma.cc/D2HS-UDZ9], or he could have requested that the problematic phrase be excised from the elements instruction,[5] *see Lewis*, 2014 UT App

---

5. The latter course might have been the most logical one in this case, as the State did not argue that Ray was guilty of forcible sexual abuse because he took indecent liberties with Victim. The State overtly relied exclusively on the particular acts enumerated in the statute, specifically contending that he had touched Victim's breast and/or vagina. Although the solution to this problem is easy enough on a case-by-case basis, albeit often at the price of a reversal and retrial, we believe the Legislature would be well-advised to revisit Utah Code sections 76–5–404(1) and 76-5-404.1(2) and fix this problem. It could do so by excising the vague phrase from the statutes, by including in the appropriate statute the definition of the phrase that has been judicially embraced, or by spelling out the specific other acts the Legislature determines should also constitute forcible sexual

(continued…)

241, ¶ 9 n.7. But under the circumstances, "[t]here was no conceivable tactical benefit to [Ray] for trial counsel to allow a jury instruction that described the offense in a manner that is inconsistent with the narrow way in which Utah courts have interpreted the applicable statute," *see id.* ¶ 13, leaving the jury to employ its own common sense view of what "indecent liberties" are, a view that likely encompasses a much wider range of conduct than is contemplated in the legal sense.

## II. Trial Counsel's Deficient Performance Prejudiced Ray.

¶21　"Performance is deficient when it falls below an objective standard of reasonableness. . . . A defendant suffers prejudice when, absent the deficiencies of counsel's performance, there is a reasonable likelihood that the defendant would have received a more favorable result at trial." *State v. Hards*, 2015 UT App 42, ¶ 18, 345 P.3d 769.

¶22　In this case, several circumstances compel a conclusion of prejudice. First, the jury acquitted Ray as to a count of object rape and was unable to reach a verdict as to two forcible sodomy counts, while convicting him only on the forcible sexual abuse count. This means the jury credited Victim's trial testimony that Ray never digitally penetrated her vagina, and it means that one or more jurors did not believe Victim's testimony that Ray performed oral sex on her and she on him. Although the sexual abuse conviction could mean that the jury believed Victim's testimony that Ray put his hand down her pants, touching the outside of her vagina, and up her bra, touching her breast, it is just as likely, especially given Victim's credibility issues, that the jury rejected this testimony, too, but concluded that a twenty-eight-year-old married man passionately kissing a fifteen-year-old while both were naked is "socially or morally reprehensible

---

(…continued)

abuse. *See* Utah Code Ann. § 76-5-404(1) (LexisNexis 2012); *id.* § 76-5-401.1(2) (Supp. 2016).

or . . . [otherwise] totally inappropriate"—conclusions with which one cannot reasonably argue—and thus constituted the taking of "indecent liberties." *See State v. Lewis*, 2014 UT App 241, ¶ 15, 337 P.3d 1053.

¶23 Second, Victim's credibility issues only increase the possibility that the jury convicted Ray based on moral condemnation and social disapprobation rather than the narrow terms of the law. *Mills v. Maryland*, 486 U.S. 367, 377 (1988) (stating that "[u]nless we can rule out the substantial possibility that the jury may have rested its verdict on [an] 'improper' ground, we must remand"). Because we cannot know how the jury decided given the evidence before it and the obvious skepticism with which it apparently viewed Victim's testimony in general, and because it may well have based its decision on improper grounds, "the general effect of [this] uncertain verdict is fatal to it." *See Brannigan v. People*, 24 P. 767, 771 (Utah 1869). "No verdict so defective . . . in substance can be corrected or changed by presumptions against [Ray]." *See id.* The sum total of these circumstances "mak[es] it much more likely that [the jury] would have reached a different conclusion but for trial counsel's ineffectiveness," and we must, therefore, reverse and remand for a new trial.[6] *See Landry v. State*, 2016 UT App 164, ¶ 43, 380 P.3d 25.

### III. Victim's Testimony Was Not "Inherently Improbable."

¶24 In view of our reversal, we consider a separate issue Ray presents. Ray argues that Victim's lack of credibility—due largely to what he characterizes as her constantly changing account—amounts to "inherent improbability" as defined in

---

6. Because we reverse Ray's conviction and remand for a new trial on the strength of his ineffective-assistance/jury-instruction claim, we do not reach the balance of the issues Ray raises on appeal, with the exception of the question answered in section III.

*State v. Robbins*, 2009 UT 23, 210 P.3d 288, entitling him to a reversal of his conviction without the State having the opportunity to retry him. We disagree and take this opportunity to explain our understanding of the *Robbins* doctrine.

¶25 *Robbins* was something of a unique case, combining distinctly incredible testimony with what the Supreme Court termed "patently false statements." *Id.* ¶ 22. "Inherent improbability" is a distinction reserved for such comparatively rare instances; it does not apply more generally to cases involving a victim's incredibility—not even significant incredibility. For example, an "inherent improbability" might be found if the testimony offered "flies in the face of uncontroverted physical facts" or well-known physical phenomena. *See Haarstrich v. Oregon Short Line R. Co.*, 262 P. 100, 104 (Utah 1927) (noting that testimony in contradiction of physical facts "is not substantial evidence"). *Cf. Blomberg v. Trupukka*, 299 N.W. 11, 13 (Minn. 1941) ("The operation of the law of gravity is a matter of such common knowledge that all persons of ordinary intelligence and judgment, even if they are illiterate, are required to take notice of it."). Another such instance is patent falsehood, the variant of improbability at issue in *Robbins*, where the victim referred to a possible eavesdropper located in a closet that she claimed to be within a room that did not, in fact, have a closet and also "made up a story about a hearing problem." *See* 2009 UT 23, ¶ 23. In all other instances we can envision, however, we defer to the jury to sort out fact from fiction, because "the jury serves as the exclusive judge of . . . the credibility of witnesses." *State v. Johnson*, 2015 UT App 312, ¶ 10, 365 P.3d 730 (citation and internal quotation marks omitted). This deference is appropriate in the fairly common situation of a victim whose story changes over time or who never seems to tell her story the same way twice, as in this case. Such inconsistency clearly creates a credibility question for the jury to resolve, but it does not trigger the applicability of the "inherent improbability" doctrine.

¶26 As we recently noted, "In judging whether testimony is inherently improbable, a witness's inconsistency is not dispositive." *State v. Crippen*, 2016 UT App 152, ¶ 13, 380 P.3d 18. Indeed, this distinction between *Robbins*-esque circumstances and more routine witness inconsistency is hardly new. As early as 1955 the Utah Supreme Court explained that

> [w]hile it is true that if a witness willfully testifies falsely as to any material matter the jury is at liberty to disbelieve the whole of his testimony if they so desire, it does not necessarily follow that they are obliged to do so. . . .
>
> It is the duty of this court to leave the question of credibility of witnesses to the jury or fact trier . . . . As has often been said, the jury is in a favored position to form impressions as to the trust to be reposed in witnesses. They have the advantage of fairly close personal contact; the opportunity to observe appearance and general demeanor; and the chance to feel the impact of personalities. All of which they may consider in connection with the reactions, manner of expression, and apparent frankness and candor or want of it in reacting to and answering questions on both direct and cross-examination in determining whether, and to what extent, witnesses are to be believed. . . .
>
> *It is not a prerequisite to credibility that a witness be entirely accurate with respect to every detail of his testimony.* If it were so, human frailties are such that it would be seldom that a witness who testified to any extent could be believed. . . . An examination of the record here does not show that facts testified to would be impossible in the light of

> known physical facts, or so contradictory or uncertain as to justify a conclusion that . . . the witnesses were entirely 'unworthy of belief' . . . .

*Gittens v. Lundberg*, 284 P.2d 1115, 1117 (Utah 1955) (emphasis added). *Accord State v. Prater*, 2017 UT 13, ¶ 38 (explaining that in *Robbins*, it "was the inconsistencies in the child's testimony *plus* the patently false statements the child made *plus* the lack of any corroboration that allowed this court to conclude that insufficient evidence supported Robbins's conviction") (emphasis in original).

¶27    Although the jury apparently disbelieved Victim as to many aspects of her testimony—it could not reach a verdict on two of the four charges against Ray and acquitted him of a third—it likely believed other aspects of her testimony. The jury's finding of Ray's guilt as to the remaining charge at least suggests this possibility, *see Gittens*, 284 P.2d at 1117 ("The jury may evaluate the testimony of witnesses and accept those parts which they deem credible, even though there be some inconsistencies."), although the likelihood that the misapplication of "indecent liberties" explains its single guilty verdict admittedly makes that proposition questionable. Again, issues of credibility, as opposed to inherent improbability, are for the jury to decide, not this court. *See id.*; *State v. Johnson*, 2015 UT App 312, ¶ 10, 365 P.3d 730. Accordingly, we reject Ray's argument that we should simply vacate his sexual abuse conviction on the ground of inherent improbability.

CONCLUSION

¶28    For the reasons explained above, we reverse Ray's conviction for forcible sexual abuse and remand for a new trial or such other proceedings as may now be appropriate.

————————