*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2020 UT 12**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Petitioner,*

*v.*

ERIC MATTHEW RAY,
*Respondent.*

No. 20170524
Heard April 11, 2018
Filed March 9, 2020

On Certiorari to the Utah Court of Appeals

Fourth District, Provo
The Honorable Lynn W. Davis
No. 101401511

Attorneys:[1]

Sean D. Reyes, Att'y Gen., Karen A. Klucznik, Asst. Solic. Gen.,
Salt Lake City, for petitioner

Douglas J. Thompson, Provo, for respondent

JUSTICE PETERSEN authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PEARCE joined.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1    Eric Matthew Ray was convicted of forcible sexual abuse
of R.M., who was fifteen years old at the time. He appealed the

---

[1] *Amicus curiae* attorneys are:
Jennifer Springer, Jensie L. Anderson, Salt Lake City, for the
Rocky Mountain Innocence Center.

conviction, and the court of appeals concluded Ray's trial counsel provided ineffective assistance because he did not object to the jury instruction for forcible sexual abuse. The instruction included an option to convict Ray if he took "indecent liberties" with R.M., but it did not define that phrase. The court of appeals concluded counsel was ineffective because he did not object to the jury instruction and ask the district court to either omit the phrase "indecent liberties" or define it. The question before us is whether the court of appeals erred in this determination.

¶2    Under the circumstances here, we conclude defense counsel's performance was not deficient. Accordingly, we reverse and reinstate Ray's conviction.

### BACKGROUND[2]

¶3    Ray, a twenty-eight-year-old man who was attending law school in Illinois, accidentally texted R.M., a fourteen-year-old girl living in Utah. Although Ray had texted the wrong number, the two continued communicating via text messages, social media, and eventually telephone. Over time, R.M. started to have romantic feelings for Ray. He reciprocated. They discussed sex, love, and marriage. And eventually, Ray flew to Utah over his spring break to meet R.M. in person. At the time of Ray's visit, R.M. was fifteen years old.

¶4    On the first day of Ray's visit, he picked up R.M. from school and took her to his hotel room. They spent hours kissing on his bed, and he touched her "bra" and "underwear areas." Finally, he dropped her off on a corner near her home. Over the next three days, Ray continued to pick up R.M., take her to his hotel room, and engage in progressively serious sexual activity — except for one day when R.M. was grounded and only did homework in Ray's rental car for about an hour.

¶5    Although R.M. kept her interaction with Ray a secret from her family, her parents eventually learned of it. Less than a week after Ray left Utah, R.M. became extremely ill and was

---

[2] "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565 (citation omitted).

hospitalized for ten days. When Ray learned R.M. was sick, he repeatedly contacted the hospital and R.M.'s parents about her. He claimed to be a school friend named "Edward Matthews."

¶6   When "Edward Matthews" mentioned knowing about an infection in R.M.'s vaginal area, R.M.'s mother considered this a "red flag." Looking for more information, R.M.'s mother found an Edward Matthews on a list of R.M.'s Facebook friends. She then found a picture that was tagged with both Ray's name and the name Edward Matthews. R.M.'s phone also contained photos of Ray.

¶7   R.M.'s family contacted a neighbor who in turn contacted a detective, informing the detective that the family was seeking help in uncovering the connection between R.M. and Ray. The detective went to the hospital and spoke with R.M.'s parents. He then spoke with R.M., but for only about ten minutes because she "was in a sedated state," was "slow to respond," and her answers "started getting" incoherent. R.M. disclosed some information about Ray and her contact with him.

¶8   The detective also posed as R.M. on Facebook and engaged in a conversation with Ray, attempting to elicit more information about Ray's contact with R.M.

¶9   Ultimately, the State charged Ray with one count of object rape, two counts of forcible sodomy, and one count of forcible sexual abuse. In the district court proceedings, R.M. testified at a preliminary hearing and at trial.

¶10  During Ray's trial, R.M. testified about what took place when Ray visited Utah. On the first day, a Wednesday, Ray met R.M. at her school and took her to his hotel room. There, Ray gave R.M. her first kiss. For hours the two talked, kissed, and lay on the bed together. Ray also touched R.M.'s "bra" and "underwear areas." He dropped her off at a corner near her house over five hours later.

¶11  On Thursday, Ray again met R.M. at her school. This time, they were joined by R.M.'s friend and the friend's boyfriend. As her friends swam in the hotel pool, Ray and R.M. went to Ray's room, disrobed to their underwear, lay on the bed, and kissed for about an hour. Ray touched R.M.'s breasts, both over and under her bra. He also touched R.M.'s buttocks and her vagina over her underwear. R.M. touched Ray's "private parts" over his underwear, but she refused his request for a "hand job."

¶12 The two then got dressed and played a game Ray had brought—"Sexy Truth or Dare"—with R.M.'s friend and her boyfriend. Ray also showed them photos of sex toys. He drove them home, again dropping R.M. off at the corner near her house.

¶13 On Friday, Ray again met R.M. at her school. But she was grounded that day, so she just did homework for a short while in Ray's car.

¶14 Early Saturday morning, Ray texted R.M. about getting together. They arranged for him to pick her up as she walked toward her school, and he again took her to his hotel room. Ray had decorated his room with flower petals and candles. They started "making out." After kissing awhile, R.M. took a shower and shaved her pubic area with Ray's razor. In an earlier conversation, Ray had asked her to do this. She returned to the room naked. Ray was also naked. As they kissed on the bed, Ray touched outside R.M.'s vagina with his fingers. Still naked, the two watched the movie "New Moon" from the Twilight Series. Ray mentioned "a few times" how far they "could go without getting in trouble with the law."

¶15 R.M. testified that Ray then performed oral sex on her, and she reciprocated.[3] She also testified that Ray asked her if she wanted to have sexual intercourse, but when she said she "wasn't ready," he said "he was okay to wait." Ray then gave R.M. "a candle, a tee shirt, and a vibrator." She testified that Ray told her to "think of him" when she used it.

¶16 The State admitted into evidence Ray's electronic conversations with the detective posing as R.M. Ray's statements corroborated portions of R.M.'s testimony. Ray referenced: that the two had "kissed" and "made out"; getting "into bed and kiss[ing] for the rest of the day"; playing "truth or dare"; and "the buzzy toy."

¶17 Ray's defense was that he had not engaged in any sexual activity with R.M. In the alternative, he argued that if the jury did believe R.M.'s testimony, any sexual activity was consensual. Ray

---

[3] The jury could not reach a unanimous verdict on the two forcible sodomy counts, which were based on R.M.'s testimony that she and Ray had engaged in oral sex with one another. We include this testimony not as an established fact, but to describe the events at trial.

developed his defense through cross-examination of the State's witnesses, including R.M. Defense counsel cross-examined R.M. about variances in the statements she made to the detective, to family members, during her testimony at the preliminary hearing, and during her testimony at trial.[4]

¶18  With regard to the forcible sexual abuse count, the district court instructed the jury that in order to find Ray guilty, the jury must find that each of the following essential elements of the crime were proven beyond a reasonable doubt:

1.  That the defendant, Eric Ray;

. . .

4.  Did intentionally, knowingly, or recklessly;

5.  Touched [sic] the anus, buttocks, or any part of the genitals of another, or touched [sic] the breasts of a female person 14 years of age or older, *or otherwise took indecent liberties with the actor or another*[;]

6.  With the intent to arouse or gratify the sexual desires of any person[;]

7.  Without the consent of the other, regardless of the sex of any participant.

---

[4] For example, counsel elicited that at trial, R.M. testified that her feelings about Ray changed as early as September 2009, but on prior occasions R.M. testified and shared with others that her feelings changed in November or December 2009 or January 2010. At the preliminary hearing, R.M. testified that before March 2010, Ray had "not really" brought up sexual intercourse, which counsel characterized as "the exact opposite" of what she testified to at trial. At the preliminary hearing, R.M. testified that she and Ray "made out" on the first day of his visit and that he did not attempt to do anything other than kiss her that day. But at trial, R.M. testified that on the first day Ray touched her on her bra and underwear. And finally at trial, R.M. testified that after showering and shaving on Saturday, she exited the shower without getting dressed and lay on the hotel bed. But at the preliminary hearing, R.M. testified that she showered, shaved, and then got dressed and went back into the room.

(Emphasis added.) To establish that R.M. did not consent, the State had to prove that she was "14 years of age or older, but younger than 18 years of age"; Ray was "more than three years older than [R.M.]"; and Ray "entice[d] or coerce[d] [her] to submit or participate." *See* UTAH CODE § 76-5-406(11) (2010). [5]

¶19 The district court did not provide a definition of "indecent liberties." And defense counsel did not object to this instruction.

¶20 The jury found Ray guilty of forcible sexual abuse, but acquitted Ray of object rape and could not reach a verdict on the two counts of forcible sodomy. Ray appealed.

¶21 In the court of appeals, Ray made a number of arguments, including that his trial counsel was ineffective for failing to object to the jury instruction for forcible sexual abuse. The court of appeals agreed, and it reversed Ray's convictions and remanded for a new trial.

¶22 We granted the State's petition for certiorari. We exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶23 "On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *State v. Baker*, 2010 UT 18, ¶ 7, 229 P.3d 650. "When we are presented with a claim of ineffective assistance of counsel, we 'review a lower court's purely factual findings for clear error, but [we] review the application of the law to the facts for correctness.'" *Ross v. State*, 2019 UT 48, ¶ 65, 448 P.3d 1203 (alteration in original) (citation omitted).

## ANALYSIS

¶24 The only question before us is whether the court of appeals wrongly concluded that Ray's counsel provided ineffective assistance at trial. The Sixth Amendment to the United States Constitution guarantees criminal defendants the effective assistance of counsel, and we evaluate claims of ineffective assistance under the standard articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *See*

---

[5] Because the statute has since been amended, we cite to the version of the statute then in effect.

*State v. Sessions*, 2014 UT 44, ¶ 17, 342 P.3d 738. To prevail on this claim, Ray must demonstrate that (1) his counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687–88.

¶25 Ray argues his counsel performed deficiently when he did not object to the undefined term "indecent liberties" in the forcible sexual abuse jury instruction. A person is guilty of forcible sexual abuse "if the victim is 14 years of age or older" and

> the actor touches the anus, buttocks, or any part of the genitals of another, or touches the breast of a female, or *otherwise takes indecent liberties with another* . . . with intent to cause substantial emotional or bodily pain to any person or with the intent to arouse or gratify the sexual desire of any person, without the consent of the other.

UTAH CODE § 76-5-404(1) (2010) (emphasis added).

¶26 Accordingly, the forcible sexual abuse statute establishes two variants of the offense. The first variant relates to the touching of specific areas of another's body (touching variant). The second variant is more general and establishes that "otherwise tak[ing] indecent liberties with another" constitutes forcible sexual abuse (indecent liberties variant).

¶27 However, at the time of the offense here, the statute did not define the term "indecent liberties."[6] We have interpreted the statute's use of the disjunctive "or" in combination with the term "otherwise" to mean that the indecent liberties variant "proscribe[s] the type of conduct of equal gravity to that interdicted in the first part" of the statute. *In re J.L.S.*, 610 P.2d 1294, 1295 (Utah 1980); *see also State v. Maestas*, 2012 UT 46, ¶ 273 n.371, 299 P.3d 892 (noting that we have "applied the doctrine of ejusdem generis" in interpreting this phrase). And we have cautioned that the term "indecent liberties" "cannot derive the requisite specificity of meaning required constitutionally" unless

---

[6] Until 2019, the statute did not define "indecent liberties." But it now does. *See* UTAH CODE § 76-5-416. The legislature has also clarified that "any touching, even if accomplished through clothing, is sufficient to constitute the relevant element" of forcible sexual abuse. *Id.* § 76-5-407(3).

it is considered to refer "to conduct of the same magnitude of gravity as that specifically described in the statute." *In re J.L.S*, 610 P.2d at 1296; *see also State v. Lewis*, 2014 UT App 241, ¶¶ 11–13, 337 P.3d 1053. Only then is "the potential infirmity for vagueness . . . rectified." *In re J.L.S*, 610 P.2d at 1296.

¶28 With regard to the first prong of *Strickland*, the court of appeals concluded that in light of the precedent discussed above, counsel's acceptance of the jury instruction here amounted to deficient performance. The court of appeals explained,

> Neglecting to provide an instruction as to the meaning of "indecent liberties" amounted to a failure to instruct the jury as to all the essential elements of the offense . . . [a]nd just as failure to instruct the jury as to the elements of the charged offense would constitute reversible error, in the context of the case before us, the failure to request an instruction explaining the element of "indecent liberties" constitutes objectively unreasonable assistance by counsel.

*State v. Ray*, 2017 UT App 78, ¶ 19, 397 P.3d 817 (citations omitted).

¶29 The court of appeals reasoned that "defense counsel had two basic options consistent with his duty to render effective assistance. Either he could have requested an instruction defining 'indecent liberties,' or he could have requested that the problematic phrase be excised from the elements instruction." *Id.* ¶ 20 (citation omitted). The court of appeals concluded that "[t]here was no conceivable tactical benefit to [Ray]" in taking neither of these actions, and therefore trial counsel performed deficiently. *Id.* ¶¶ 19–20 (alterations in original).

¶30 The State argues that the court of appeals' analysis was incorrect. We agree.

¶31 First, not objecting to an error does not automatically render counsel's performance deficient. We agree with the court of appeals that a district court instructing a jury on forcible sexual abuse should define indecent liberties. *See In re J.L.S.*, 610 P.2d at 1296 (cautioning that indecent liberties "cannot derive the requisite specificity of meaning required constitutionally" unless it is considered to refer "to conduct of the same magnitude of gravity as that specifically described in the statute"). But it does not automatically follow that counsel's acquiescence to an

instruction that did not do so was unreasonable *per se*. The United States Supreme Court has rejected the notion that certain actions by counsel are *per se* deficient "as inconsistent with *Strickland*'s holding that 'the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.'" *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000) (quoting *Strickland*, 466 U.S. at 688). "[T]he reasonableness of counsel's challenged conduct" must be judged "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

¶32 Thus, it is not correct to equate counsel's submission to an error with deficient performance. Defense counsel did not have a Sixth Amendment obligation to correct every error that might have occurred at trial, regardless of whether it affected the defendant. Counsel could pick his battles. We must view a decision to not object in context and determine whether correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought.

¶33 Second, the ultimate question is not whether counsel's course of conduct was strategic, but whether it fell below an objective standard of reasonableness. In assessing counsel's performance, the court of appeals determined that counsel's assent to the jury instruction yielded "no conceivable tactical benefit to [Ray]." *Ray*, 2017 UT App 78, ¶ 20 (alteration in original). The court of appeals reasoned that if the defendant demonstrates "there is no way that counsel's actions might be considered sound trial strategy, then the presumption [of reasonable assistance] is overcome." *Id.* ¶ 18 (citation omitted) (internal quotation marks omitted).

¶34 But *Strickland* demands reasonable assistance, not strategic assistance. *See Flores-Ortega*, 528 U.S. at 481 ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."). It is correct that the United States Supreme Court has directed reviewing courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. But "these presumptions are simply tools that assist [courts] in analyzing *Strickland*'s deficient performance prong." *Bullock v. Carver*, 297 F.3d 1036, 1046 (10th

Cir. 2002). If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance.[7] *See Strickland*, 466 U.S. at 688. But the converse is not true. "[E]ven if an omission is inadvertent" and not due to a purposeful strategy, "relief is not automatic." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

> [W]hether a counsel's actions can be considered strategic plays an important role in our analysis of *Strickland's* deficient performance prong. As a general matter, we presume that an attorney performed in an objectively reasonable manner because his conduct *might* be considered part of a sound strategy. Moreover, where it is shown that a challenged action was, in fact, an adequately informed strategic choice, we heighten our presumption of objective reasonableness and presume that the attorney's decision is nearly unchallengeable. The inapplicability of these presumptions (because, for example, the attorney was ignorant of highly relevant law) does not, however, automatically mean that an attorney's performance was constitutionally inadequate. Instead, we still ask whether, in light of all the circumstances, the attorney performed in an objectively reasonable manner.

*Bullock*, 297 F.3d at 1051.

¶35 Language in some of our appellate case law has muddied this point. *See, e.g.*, *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 ("To satisfy the first part of the test, defendant must overcome the strong presumption that [his] trial counsel rendered adequate assistance, by persuading the court that there was *no conceivable*

---

[7] We note the concern of *amicus curiae* that "virtually any act or omission of trial counsel could be construed as part of a hypothetical 'strategy' (rather than an error that is objectively unreasonable)." But when inquiring whether counsel may have had a sound trial strategy, it must fall "within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *see also State v. Vallejo*, 2019 UT 38, ¶¶ 41–70, 449 P.3d 39. An objectively unreasonable strategy will not suffice.

*tactical basis* for counsel's actions." (alteration in original) (citation omitted) (internal quotation marks omitted)); *Lewis*, 2014 UT App 241, ¶ 13 (finding counsel deficient where there "was no conceivable tactical benefit" to his omission); *State v. Doutre*, 2014 UT App 192, ¶ 24, 335 P.3d 366 ("If clearly inadmiss[i]ble evidence has no conceivable benefit to a defendant, the failure to object to it on nonfrivolous grounds cannot ordinarily be considered a reasonable trial strategy.").

¶36 We take the opportunity to clarify and realign our case law on this point with United States Supreme Court precedent. To be clear, it was not error for the court of appeals to assess whether counsel may have had a sound strategic reason for not objecting to the jury instruction. Indeed, the United States Supreme Court has directed that defendants must overcome such a presumption. *See Strickland*, 466 U.S. at 689. But when the court of appeals concluded there was no strategic reason for counsel to not object to the instruction, the deficiency analysis was not at an end. A reviewing court must always base its deficiency determination on the ultimate question of whether counsel's act or omission fell below an objective standard of reasonableness. Here, that means we must ask whether defining indecent liberties was sufficiently important under the circumstances that counsel's failure to argue for a clarifying jury instruction fell below an objective standard of reasonableness. *See id.*

¶37 Under the circumstances here, we disagree with the court of appeals' conclusion that counsel's acquiescence to the jury instruction could not have been sound strategy. Importantly, neither side put the precise meaning of "indecent liberties" at issue. The State focused on the specific touching variant of forcible sexual abuse, not "indecent liberties."[8]

¶38 And the definition of "indecent liberties" was not pertinent to Ray's defense. Ray's primary defense was that he had not engaged in sexual activity with R.M. at all. Counsel pursued

---

[8] The State focused on evidence related to the touching variant: i.e., that Ray had touched R.M.'s breasts over and under her bra, her buttocks, and her vagina. The State briefly mentioned indecent liberties only one time in its closing argument, connecting it to R.M.'s testimony that she had "touched [Ray's] private part in the front."

this strategy by cross-examining R.M. and highlighting inconsistencies in her various statements. He devoted most of his closing argument to challenging R.M.'s credibility as a witness, telling the jury to "think about all the lies that she's told." In the alternative, he argued that if the jury did believe her, there had been no enticement or coercion because the entire relationship was consensual. Importantly, Ray did not parse the evidence of sexual conduct to argue that it did not rise to the level of forcible sexual abuse.

¶39 Within that context, counsel could have made a "reasonable professional judgment," *Strickland*, 466 U.S. at 690, not to draw the State's attention to the indecent liberties variant. While the State did not focus its attention on indecent liberties, it could have. The statute gave the State the option of proving either variant of forcible sexual abuse.

¶40 And counsel could have reasonably concluded there was credible evidence before the jury that, while it did not fit within the specific touching variant, could have constituted indecent liberties. For example, R.M. testified that in addition to Ray touching her, she and Ray spent hours "making out" in a hotel room, watched a movie together while they were naked, and that she had touched the front of his "private parts."

¶41 And Ray's own statements corroborated much of this. In his electronic communications with the detective posing as R.M., Ray referenced: that the two had "kissed" and "made out"; getting "into bed and kiss[ing] for the rest of the day"; playing "truth or dare"; and "the buzzy toy."

¶42 In light of this evidence, which came partly from Ray himself, counsel could have reasonably concluded that clarifying indecent liberties would not help clear Ray and could instead broaden the State's arguments against him. While counsel's focus was that the inconsistencies in R.M.'s statements showed she could not be believed at all, counsel could have reasonably judged that even if the jury did not fully accept this argument, the inconsistencies he highlighted would more effectively undermine the State's proof on charges involving specific acts rather than more general "indecent liberties."

¶43 We conclude counsel could have reasonably preferred the State to remain focused on the specific touching variant of forcible sexual abuse, and chosen not to draw the State's attention to the indecent liberties variant by objecting to the related jury

instruction.[9] Accordingly, Ray has failed to overcome the "strong presumption" that his counsel exercised reasonable professional judgment.

¶44 We clarify, however, that even if we were unable to conceive of a possible sound strategy behind counsel's conduct, it would not have ended our analysis. We would have proceeded to determine whether correcting the erroneous jury instruction was sufficiently important that counsel's inaction was objectively unreasonable. In light of the fact that neither side had put the meaning of indecent liberties at issue, and that it was not germane to the defense, we likely would have arrived at the same conclusion.

¶45 Because we conclude counsel's performance was not deficient, we do not address the prejudice prong of *Strickland*.

## CONCLUSION

¶46 We conclude that Ray's counsel did not provide ineffective assistance. Accordingly, we reverse and reinstate Ray's conviction. We remand to the court of appeals to address Ray's remaining claims.

———————————

---

[9] The court of appeals assumed counsel could have successfully asked for "indecent liberties" to be either clarified or excised. But the indecent liberties alternative is statutorily established, and there was trial evidence in support of it. (For example, in its closing the State referenced R.M.'s testimony that she had "touched [Ray's] private part in the front," which is not specifically listed in the touching variant of forcible sexual abuse but would likely be deemed equally serious by a factfinder.) Accordingly, we are not certain that if defense counsel had objected to the term as overly vague, the court would have given counsel the option of deleting it, because a definition would have addressed counsel's concern.