2021 UT App 3

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
GARY JAMIESON,
Appellant.

Amended Opinion[1]
No. 20150863-CA
Filed January 7, 2021

First District Court, Logan Department
The Honorable Brandon J. Maynard
No. 121101017

Emily Adams and Freyja Johnson, Attorneys
for Appellant

Sean D. Reyes, Jeanne B. Inouye, and Karen A.
Klucznik, Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

---

1. This Amended Opinion replaces the Opinion in Case No. 20150863-CA, issued on December 29, 2017. After our previous opinion issued, the State petitioned the Utah Supreme Court for certiorari review of this court's ruling regarding Jamieson's ineffective assistance of counsel claim; the supreme court "provisionally granted" the petition, but stayed proceedings pending the outcome of *State v. Ray*, 2020 UT 12, 469 P.3d 871, and *State v. Scott*, 2020 UT 13, 462 P.3d 350. Following issuance of its opinions in those cases, the supreme court issued an order remanding this case back to this court "for further proceedings in light of the opinions in *Ray* and *Scott*." After reviewing *Ray* and *Scott*, as well as supplemental briefing submitted by the parties, we issue this Amended Opinion.

HARRIS, Judge:

¶1 Gary Jamieson downloaded, without authorization, over 1,400 of his boss's emails and disseminated them to outside parties. He later pled guilty to one count of "computer crimes," a class A misdemeanor. *See* Utah Code Ann. § 76-6-703(1) (LexisNexis 2017). The State sought restitution on behalf of his employer (Company), the victim of the crime. After holding a hearing, the district court calculated complete restitution in the amount of $120,378.27, a figure representing, in large part, the estimated value of the time Company officials spent dealing with the aftereffects of the email download.

¶2 Jamieson appeals from the restitution order, and asks us to consider two arguments.[2] First, he argues that the district court improperly included in its restitution figure at least some amount for time spent by Company employees while participating in the criminal case (e.g., attending hearings). Jamieson did not raise this argument below, but contends that the district court plainly erred by including any such amounts in

---

2. In his briefing on appeal, Jamieson raised a third argument: that his counsel was ineffective for failing to move to withdraw Jamieson's guilty plea after the court had already sentenced him. In connection with this argument, Jamieson filed a motion for remand, pursuant to rule 23B of the Utah Rules of Appellate Procedure, asking this court to remand the case to the district court for additional factual findings on the issue. However, while this case was pending, the Utah Supreme Court issued its decision in *State v. Rettig*, 2017 UT 83, 416 P.3d 520, in which the court upheld the constitutionality of Utah's plea withdrawal statute. *Id.* ¶ 13. That statute requires that "[a] request to withdraw a plea of guilty . . . be made by motion before sentence is announced." Utah Code Ann. § 77-13-6(2)(b) (LexisNexis 2017). In light of the supreme court's decision in *Rettig* and the statute's plain mandate, Jamieson has since withdrawn this third argument as well as his related rule 23B motion.

its calculation. Second, Jamieson asserts that he received ineffective assistance of counsel because his attorney failed to take issue with the Company CEO's claim that he had devoted 553 hours to dealing with the email download.

¶3   We find Jamieson's arguments persuasive. Accordingly, we vacate the restitution order and remand the case to the district court for a new restitution hearing.

BACKGROUND

¶4   Jamieson was employed by Company as its chief engineer. In May 2011, Jamieson contacted another Company employee and requested access to the Company Chief Executive Officer's (the CEO) emails. At that time, the CEO was out of the country and was not reachable by phone. The employee gave Jamieson "remote access to [the CEO's] computer, bypassing the firewall, other network protections and password controls," thereby allowing Jamieson direct access to the CEO's computer. Jamieson had full access to the CEO's computer for about twenty minutes, and in that time period Jamieson printed out several hard copy files and downloaded many of the CEO's emails onto a thumb drive. In this fashion, Jamieson obtained "at least" 1,400 emails comprising some 2,000 printed pages. The emails were "very confidential" and included information regarding employee compensation, pending business deals, plans to hire a competitor's employees, and communications with other industry professionals.

¶5   Later, believing that Company was involved in illegal activity, Jamieson told the CEO that "I have your email[s], they're very damning, I'm going to take you down." Jamieson disseminated the emails to a federal government agency, federal law enforcement officials, and a local news organization. Company eventually fired Jamieson.

¶6   The State charged Jamieson with one felony count of "computer crimes." *See* Utah Code Ann. § 76-6-703(1)

(LexisNexis 2017).[3] At a preliminary hearing before a magistrate, the CEO was asked how much time he had spent "dealing with the fallout from [Jamieson's] disclosures," and he responded that he had not kept time records, and "wish[ed] [he] could recall that." He gave an "estimate," however, stating that "on average" he had spent "an hour a day . . . over a two-year period." He acknowledged that a lot of the time he spent "was a rehash and trying to reconstruct what brought this whole thing on," and attempting to "rehears[e] and re-rehears[e] the sequence of events that led to this." The magistrate bound the case over for trial and, after plea negotiations, Jamieson pled guilty to one count of "computer crimes" as a class A misdemeanor.

¶7      After Jamieson pled guilty, the State sought a total of $164,609.77 in restitution. The bulk of this request consisted of time spent by the CEO. Indeed, the State asserted that the CEO had spent "553 hours (at minimum) . . . reviewing printed emails, meeting with local [and federal] counsel, police investigators, [and] staff," and that the value of the CEO's time totaled $110,600. The State also sought $7,500 for time spent by three other Company employees, including its vice-president.

¶8      The restitution hearing was scheduled and postponed several times. The hearing was finally held in September 2015[4] and, at the hearing, the district court posed direct questions about the 553 hours that the CEO claimed to have spent, asking Company counsel to "[h]elp me understand the 553 hours." Company counsel proffered the testimony of the CEO and vice-president as follows:

---

3. The State also charged Jamieson with theft. On Jamieson's motion, the district court severed the theft charge from the other charges, and Jamieson later pled guilty to the theft charge in a separate case. That case is not at issue in this appeal.

4. The district court held the sentencing hearing and restitution hearing on the same day.

> [T]he time that they had spent would probably fall into one of two pots. The time that was directly related to mitigating the damages and time that they'd spent dealing with the criminal process in general. Because we've been in court three or four times for this restitution hearing to be continued. So I asked them to allocate that . . . . What they responded to me was—their initial reaction was about 75 percent of [their time] fell into the former pot and about 25 percent in the latter.

The CEO also stated that he "wished he would have kept better records related to the time he spent on those [charges]."

¶9    The court invited Jamieson's attorney to ask questions of the Company employees. Jamieson's attorney asked one specific question—whether the vice-president was a salaried employee—but otherwise declined to examine the Company employees whose time was at issue. Specifically, counsel did not take the opportunity to question the CEO about his claim that he had devoted 553 hours to this case.

¶10    A few weeks after the restitution hearing, the district court issued a written decision calculating "complete restitution" at $120,378.27, a figure that was comprised almost entirely of Company employees' time. The court excluded attorney fees from the calculation, but did not make any attempt to separate and exclude Company employees' time spent attending to the criminal proceedings. The court credited the CEO with spending 553 hours on the matter, and calculated the value of the CEO's time at $110,600, exactly as the State requested. Likewise, the court granted the State's request, in its entirety, regarding the other employees' time, valuing that time at $7,500. After taking Jamieson's finances into account, the court ordered Jamieson to pay $90,000, acknowledging that "the complete restitution in this case is larger than the [c]ourt-ordered restitution."

¶11 In addition to the restitution order, the district court sentenced Jamieson to a term of 365 days in jail, with 335 days suspended. The court also imposed a probationary term of thirty-six months on Jamieson, with the payment of court-ordered restitution as one of the conditions of probation.

ISSUES AND STANDARDS OF REVIEW

¶12 Neither of the arguments Jamieson raises on appeal were preserved in the district court. "When a party fails to raise and argue an issue in the [district] court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443. Jamieson asks us to consider his arguments on appeal under the plain error and ineffective assistance of counsel exceptions to the preservation requirement. *See id.* ¶ 19 (noting that plain error and ineffective assistance of counsel are exceptions to the preservation rule).

¶13 Jamieson first argues that the district court plainly erred by including in its restitution calculation monetary damages for time the CEO and vice-president spent related to the criminal litigation. Even where an issue is preserved below, "a reviewing court will not disturb a district court's [restitution] determination unless the court exceeds the authority prescribed by law or abuses its discretion." *State v. Laycock*, 2009 UT 53, ¶ 10, 214 P.3d 104. To the extent that the district court made legal determinations in connection with its restitution analysis, we review those legal determinations for correctness. *See State v. Brooks*, 908 P.2d 856, 858–59 (Utah 1995) ("The standard of review for a simple legal interpretation of a rule or statute is correctness."). To prevail under the plain error standard, Jamieson must demonstrate that (1) an error exists; (2) the error should have been obvious to the district court; and (3) the error harmed him, "i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Bond*, 2015 UT 88, ¶ 15, 361 P.3d 104 (quotation simplified).

¶14 Second, Jamieson argues that his trial attorney was constitutionally ineffective for failing to challenge the amount of time the CEO allegedly spent addressing the aftereffects of the email download. A claim for ineffective assistance of counsel raised for the first time on appeal presents a question of law, which we review for correctness. *State v. Kozlov*, 2012 UT App 114, ¶ 28, 276 P.3d 1207.

## ANALYSIS

### I

¶15 Jamieson first argues that the district court plainly erred by including in its restitution calculation at least some amount of time spent by Company employees in addressing the criminal litigation. We agree.

¶16 The Crime Victims Restitution Act (the Act)[5] provides that "[w]hen a defendant enters into a plea disposition or is convicted of criminal activity that has resulted in pecuniary damages, . . . the court shall order that the defendant make restitution to victims." Utah Code Ann. § 77-38a-302(1) (LexisNexis 2017). The Act defines restitution as "full, partial, or nominal payment for pecuniary damages to a victim." *Id.* § 77-38a-102(11). At the time Jamieson pled guilty, the Act defined "pecuniary damages" as follows:

> all demonstrable economic injury, whether or not yet incurred, including those which a person could recover in a civil action arising out of the facts or events constituting the defendant's criminal activities and includes . . . lost earnings and

---

5. The Act, in its entirety, is codified at Utah Code Annotated sections 77-38a-101 to -601 (LexisNexis 2017).

medical expenses, but excludes punitive or exemplary damages and pain and suffering.

*Id.* § 77-38a-102(6) (2015).[6]

¶17   There are two types of restitution: "complete restitution" and "court-ordered restitution." "Complete restitution" is "a calculation of the restitution necessary to compensate [a victim] for all losses caused." *State v. Brown*, 2014 UT 48, ¶ 21, 342 P.3d 239 (quotation simplified). "Court-ordered restitution" is "a subset of complete restitution that, among other things, takes into account the defendant's circumstances." *Id.* (quotation simplified). "Where facts do not provide a full evidentiary foundation" for a restitution calculation, "the court must base its determination on the best information available." *State v. Laycock*, 2009 UT 53, ¶ 23, 214 P.3d 104; *see also* Utah Code Ann. § 77-38a-203(1)(c) (LexisNexis 2017) ("The inability, failure, or refusal of the crime victim to provide all or part of the requested information shall result in the court determining restitution based on the best information available.").

¶18   Jamieson wisely does not dispute that a restitution award can include amounts intended to reimburse crime victims for time spent attempting to mitigate the deleterious effects of the crime visited upon them. *See State v. Birkeland*, 2011 UT App 227, ¶ 9, 258 P.3d 662 ("The value of labor necessitated by another's culpable conduct has been recognized as a form of economic injury that is amenable to inclusion in a restitution award."), *overruled on other grounds by State v. Ogden*, 2018 UT 8, 416 P.3d 1132; *see also* Utah Code Ann. § 77-38a-102(6) ("lost earnings" are

---

6. The Act's definition of "pecuniary damages" was amended in 2016 and now expressly includes "travel expenses reasonably incurred as a result of participation in criminal proceedings." Utah Code Ann. § 77-38a-102(6) (LexisNexis 2017). In this opinion, we apply the 2015 version of the Act's definition of "pecuniary damages."

included as part of "pecuniary damages"). Instead, Jamieson points out that, at least under the law in effect at the time of the district court's restitution order, any time that Company employees spent attending to the criminal proceedings could not be included in a restitution order as a matter of law, *see Brown*, 2014 UT 48, ¶ 23, and argues as a factual matter that the district court's restitution order in this case improperly included at least some amount of time that falls into this category.

¶19     Jamieson's legal argument is correct. In *Brown*, our supreme court noted the "longstanding, well-settled rule" that "forecloses recovery of costs or expenses incurred in the maintenance of, or related to, litigation." *Id.* In that case, the victim asked the district court to include in its restitution order $1,228 for lost wages and travel costs incurred by the victim and her mother to attend hearings "[d]uring the criminal proceedings." *Id.* ¶¶ 6–8. The district court denied the request, and the supreme court affirmed. The court cited the then-current statutory definition of "pecuniary damages" available as part of a restitution order, which, as noted, limited the damages to those "which a person could recover in a civil action arising out of the facts or events constituting the defendant's criminal activities." *Id.* ¶ 22 (quoting Utah Code Ann. § 77-38a-102(6)). The court observed that the victim and her mother "would not be eligible to recover the lost wages or travel costs that were requested in this case" in the context of a "civil tort action against Brown arising out of his criminal activity." *Id.* ¶ 23. Accordingly, the court held that "the lost wages and expenses requested for [the victim] and her mother are not 'pecuniary damages' compensable as an element of restitution." *Id.* ¶ 24.

¶20     In response, the State acknowledges *Brown*, but asserts that its holding is limited to situations where a victim appears at a hearing voluntarily, and does not apply when a crime victim is compelled by subpoena to participate in the criminal proceeding. In support of this argument, the State points to the *Brown* court's reliance on section 914 of the Restatement (Second) of Torts. *See id.* ¶ 23. That Restatement section sets forth the

general rule that expenses incurred in maintenance of litigation are not recoverable, but in its second subsection it provides an exception for attorney fees, experts, and loss of time incurred in bringing or defending a suit against a third party in order to protect one's interests as a result of the tortfeasors' actions. *See* Restatement (Second) of Torts § 914 (Am. Law Inst. 1979). On the facts of this case, the State's reliance on this Restatement provision is misplaced.

¶21 The full text of the relevant subsection of that Restatement provision reads as follows:

> One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

*Id.* § 914(2). The comment to this subsection makes clear that this provision applies only if a prior tort (e.g., Jamieson's crime) caused a person to become a party to a subsequent suit by or against a third party: "The rule stated in [subsection 914(2)] applies when the preceding action was brought against the present plaintiff [e.g., Company] either by a third person or by the state, and also when the present plaintiff has been led by the defendant's tort [e.g., Jamieson's crime] to take legal proceedings against a third person." *See id.* § 914 cmt. b. The illustrations to the comment show that subsection 914(2) is applicable, in this context, only when the victim of a prior crime becomes embroiled in a subsequent suit as a result of that crime. *See id.* § 914 illustrations. Here, no third party has brought any subsequent action against Company seeking damages for harm Jamieson caused, and Company has not instituted any such litigation itself. Thus, subsection 914(2) is inapplicable.

¶22 The State provides no additional support for its contention that the rule set forth in *Brown*—that crime victims and their families are not permitted to include in restitution awards time spent attending to the underlying criminal proceedings, *see* 2014 UT 48, ¶ 23—should be varied in instances where a crime victim is compelled by subpoena to participate in the criminal case. We note that witnesses compelled to appear in court pursuant to subpoena are, at least nominally, compensated for their time, and although such fees often do not completely cover a witness's expenses, they do provide some level of reimbursement for a subpoenaed witness's time. *See* Utah Code Ann. § 78B-1-119(1)(a) (LexisNexis 2018) (mandating that witnesses "required . . . to attend a trial court of record" are entitled to receive "$18.50 for the first day of attendance and $49 per day for each subsequent day of attendance"). Certainly, in a civil case arising out of Jamieson's crime, the question of Company's ability to recover for its own employees' time would not turn on whether those employees were compelled to appear by subpoena. In short, we are aware of no reason why a subpoenaed witness should be treated any differently than a non-subpoenaed witness for the purpose of calculating pecuniary damages for restitution.

¶23 We conclude, therefore, that the rule announced in *Brown* applies with equal force to witnesses compelled to participate in criminal proceedings pursuant to subpoena as it does to non-subpoenaed witnesses. Accordingly, any time that Company employees spent attending to the proceedings in the State's prosecution of Jamieson—regardless of whether they appeared pursuant to subpoena—is not compensable as restitution under the statute in effect at the time.

¶24 And as near as we can tell on the record before us, Jamieson's factual assertions—that the court's restitution order includes at least *some* amount for time Company employees spent attending hearings in the criminal case—are correct as well. The only evidence before the district court was Company counsel's proffer that "about 75 percent" of the requested hours

were spent "mitigating the damages" sustained by Jamieson's email download, and that "about 25 percent" of the requested hours were spent "dealing with the criminal process in general." It is not entirely clear from the record what is included in the latter "25 percent" category, but in the very next sentence following his description of that category, Company counsel stated that this category was necessary "[b]ecause we've been in court three or four times for this restitution hearing to be continued." The clear inference—and perhaps the only inference—that must be drawn from this statement is that the time Company employees spent attending hearings in the criminal case, including the oft-rescheduled restitution hearing, was included in the latter "25 percent" category.

¶25 It is, of course, not clear on this record whether *all* of the hours in the "25 percent" category were incurred attending court hearings or otherwise participating in the criminal case. But this question is beside the point. If even *any* of the time included in the "25 percent" category was time spent attending hearings in the criminal case, the calculation is erroneous. And it is clear that at least *some* time that falls in this category was indeed included. The district court did not undertake any analysis designed to ascertain how many of the hours that Company was requesting be included in the restitution order were hours spent attending to the criminal proceedings, and to then exclude those hours from the calculation. The district court's failure to undertake this analysis was error.

¶26 Here, however, because Jamieson failed to raise this issue below, Jamieson must show more than error—he must show that the error was plain. In order to succeed in that endeavor, Jamieson must also show that the error should have been obvious to the district court, and that he was harmed by the error. *See State v. Bond*, 2015 UT 88, ¶ 15, 361 P.3d 104. We conclude that Jamieson has made the necessary showing.

¶27 "For an error to be obvious to the [district] court, the party arguing for the exception to preservation must show that

the law governing the error was clear or plainly settled at the time the alleged error was made." *State v. Johnson*, 2017 UT 76, ¶ 21, 416 P.3d 443 (quotation simplified). In this case, the relevant rule had been articulated by our supreme court in *Brown* over a year before the district court entered its restitution order. *See* 2014 UT 48, ¶ 23. Indeed, the district court was clearly aware of *Brown*: in its written decision calculating the restitution amount, the court not only cited *Brown*, it cited the very paragraph in *Brown* where the rule is found.

¶28 And Jamieson was clearly harmed by the inclusion, in calculation of complete restitution, of amounts reimbursing Company for time its employees spent attending to the criminal proceedings: he is now liable for at least some amount of complete restitution that should not have been awarded. If the district court had undertaken the analysis required by *Brown*, it would have reduced its complete restitution order by whatever amount it determined represented time spent by Company employees attending hearings or otherwise participating in the criminal case. Because the restitution amount imposed upon Jamieson was higher than it should have been, Jamieson was clearly harmed.[7]

¶29 Accordingly, Jamieson has succeeded in demonstrating that the district court plainly erred by including at least some improper amounts in its restitution order.

---

7. Jamieson correctly points out that he would still sustain harm from an inaccurate computation of complete restitution, even if the *court-ordered* restitution amount would remain unaffected by the inaccuracy. Under Utah law, even though a defendant is obligated as part of the criminal case to pay only court-ordered restitution, a defendant is liable civilly for payment of the (often higher) complete restitution amount. *See* Utah Code Ann. § 77-38a-401 (LexisNexis 2017).

II

¶30    Jamieson next argues that his counsel was constitutionally ineffective for failing to challenge the State's assertion that the CEO had spent 553 hours attempting to address the email download. We agree with this argument as well.

¶31    The Sixth Amendment to the United States Constitution provides that criminal defendants are entitled "to have the Assistance of Counsel for [their] defence." U.S. Const. amend. VI. A criminal defendant's right to effective assistance applies to privately retained counsel, *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980), and applies at all critical stages of a criminal proceeding, including restitution hearings where restitution is ordered as part of a sentence that includes actual or suspended jail time, *State v. Cabrera*, 2007 UT App 194, ¶¶ 11–14, 163 P.3d 707. Here, the district court sentenced Jamieson to a term of 365 days in jail, with 335 days suspended. Because the district court sentenced Jamieson to actual as well as suspended jail time, he was entitled to effective assistance of counsel at the restitution hearing. *See id.*

¶32    To establish that his trial counsel was constitutionally ineffective, Jamieson must establish that (1) his counsel's performance was deficient, and (2) this "deficient performance prejudiced the defense" by giving rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). We discuss, in turn, each part of this two-prong test.

A

¶33 To determine whether counsel's performance was deficient under the first part of the test, we apply "the deficiency standard announced in *Strickland*" and ask whether counsel's actions "fell below an objective standard of reasonableness." *See State v. Scott*, 2020 UT 13, ¶ 31, 462 P.3d 350 (quotation simplified); *see also Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267

P.3d 232 ("To prevail, a defendant must show . . . that his counsel rendered a deficient performance in some demonstrable manner," and that counsel's "performance fell below an objective standard of reasonable professional judgment." (quotation simplified)). One factor courts examine, in evaluating whether an attorney performed deficiently, is whether the attorney had a strategic reason for taking the action in question. *See Scott*, 2020 UT 13, ¶ 35 (stating that "the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions"). If the court determines that the attorney had a valid strategic reason for his actions, then "it follows that counsel did not perform deficiently." *Id.*; *see also State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance.").

¶34    But our supreme court has clarified that, despite some language to the contrary in prior case law, the "converse is not true." *Ray*, 2020 UT 12, ¶ 34. A court's determination that an attorney did *not* have a valid strategic reason for his actions does not automatically lead to the conclusion that the attorney performed deficiently. *Id.*; *see also Scott*, 2020 UT 13, ¶ 36 ("[E]ven where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient."). In that situation, the court still must "ask whether, in light of all the circumstances, the attorney performed in an objectively reasonable manner." *Ray*, 2020 UT 12, ¶ 34 (quotation simplified); *see also Scott*, 2020 UT 13, ¶ 36 ("[E]ven if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable.").

¶35    In certain circumstances, there can be valid tactical reasons for counsel to decide not to challenge the State's requested restitution amount. For instance, counsel might believe that the requested amount is quite reasonable, and that

challenging the requested amount could expose the defendant to the risk that the court might order an amount even higher than the amount the State requests. *See, e.g.*, *State v. Daniels*, 2014 UT App 230, ¶ 10, 336 P.3d 1074 (determining that counsel had a valid tactical reason for stipulating to a certain restitution amount, because "counsel might very reasonably have concluded that his client risked restitution liability in excess of" the stipulated amount). Alternatively, where restitution is computed before (or contemporaneously with) sentencing, counsel might believe that challenging the requested restitution amount may exhibit a lack of contrition by the defendant, which could cause a sentencing judge to impose a harsher sentence or higher court-ordered restitution amount. *See, e.g.*, *State v. Beckstrom*, 2013 UT App 186, ¶ 15, 307 P.3d 677 (observing that stipulating to the amount of complete restitution put the defendant in a "contrite position" where she "might have had a better chance of convincing the judge to not impose the full amount of complete restitution as court-ordered restitution"); *see also Daniels*, 2014 UT App 230, ¶ 10 (stating that "counsel may have thought that it might play well for [the] [d]efendant to accept a restitution award in excess of the damages for which he admitted he was 'absolutely responsible'").

¶36   In this case, however, neither of these tactical reasons existed. First, there is no evidence in the record to suggest that the court would have had any basis to increase the number of hours above 553 had Jamieson's counsel questioned the CEO. The State's initial request for the CEO's time was 553 hours, and the State presented no evidence to support any higher figure. This case therefore differs from *Daniels*, where there was a risk, based on a "revised damage estimate" as well as on the potential that the defendant would be asked to pay restitution for damage caused by his co-defendants, that the defendant might be ordered to pay a higher restitution amount if he withdrew his stipulation to a certain amount. *See* 2014 UT App 230, ¶¶ 4, 10. Here, Jamieson was the only perpetrator, and neither the State nor Company ever asked for any figure *higher* than 553 hours for the CEO's time. There does not appear to have been any

appreciable risk that a higher figure might have been imposed if counsel took the opportunity to question the CEO.

¶37    Second, there was no risk in this case that Jamieson might have been subject to a stiffer overall sentence if he had questioned the CEO, for the simple reason that the district court sentenced Jamieson minutes *before* considering restitution-related issues. Thus, at the time Jamieson's counsel had to decide whether or not to question the CEO, there was no risk that Jamieson might have been subject to additional jail time or more onerous probation conditions.

¶38    The only issue that remained open at the time the CEO's testimony was proffered was the restitution amount itself. As noted above, there was no appreciable risk of questioning resulting in a finding of more than 553 hours, since that was the entire amount the State asked for. The only risk that remained may have been a concern that the district court would view the questioning as a lack of contrition and impose a higher court-ordered restitution amount. But on the facts of this case, it is clear that defense counsel did not choose to employ a strategy of simply stipulating to the State's requested amount of complete restitution in hopes of appearing contrite. Instead, Jamieson and his counsel made the decision to contest the State's requested restitution amounts by arguing that Company "didn't lose any money" and "had no pecuniary loss." Thus, we need not speculate about whether defense counsel, in choosing not to question the CEO about the 553 hours, was attempting to further a strategy of attempting to appear contrite, when that is a strategy that counsel clearly chose *not* to adopt here.

¶39    In the end, we are unable to conceive of any valid tactical or strategic reason that Jamieson's attorney might have had for not questioning the CEO about his claim that he spent 553 hours attempting to address Jamieson's illegal email download. However, that does not end our analysis. Under *Strickland*, as clarified in *Ray* and *Scott*, we must proceed to determine whether, even in the absence of any valid tactical purpose for

counsel's actions, counsel nevertheless acted in an objectively reasonable manner in light of all the circumstances. *See Scott*, 2020 UT 13, ¶ 36; *Ray*, 2020 UT 12, ¶ 34. And we conclude that counsel did not act in an objectively reasonable manner. Under the circumstances presented here, an attorney providing an objectively reasonable level of assistance would have conducted at least some cross-examination of the CEO regarding his claim that he spent 553 hours on matters related to Jamieson's actions.

¶40    In the context of this particular restitution hearing, the CEO's claim to have spent 553 hours attending to the aftereffects of Jamieson's crime was extremely important: it comprised the clear majority of the State's claimed restitution amount, and itself constituted a six-figure claim. This claim was unsupported by any documentation, and instead was based entirely on the CEO's unclear recollection and rough "estimate" that he had spent an hour a day for a two-year period. The CEO's time claim contrasted starkly with the time claim submitted by Company's vice-president, the employee who was initially tasked with reviewing the emails Jamieson had taken and assessing the potential damage; that employee spent only sixty hours on the matter. And the district court expressed particular interest in how the 553-hour figure was derived, asking Company counsel to "[h]elp me understand the 553 hours."

¶41    In sum, we conclude that Jamieson's trial counsel had no valid tactical reason not to follow up on the 553-hour figure, and that a reasonable attorney would have done so. Accordingly, Jamieson's counsel was objectively deficient by not questioning the CEO about the 553 hours.

B

¶42    In evaluating prejudice under the second part of the test, we assess whether there exists a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently. *See State v. Garcia*, 2017 UT 53, ¶¶ 34–38, 424 P.3d 171; *see also State v. Beckstrom*, 2013 UT App 186, ¶ 13,

307 P.3d 677 (stating that, in order to establish prejudice, a litigant must show "that 'but for counsel's unprofessional errors, the result of the proceeding would have been different'" (quoting *Strickland*, 466 U.S. at 694)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing whether a defendant has met this standard, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Garcia*, 2017 UT 53, ¶ 28 (quotation simplified).

¶43 And we are confident that the result of the restitution hearing would likely have been different if counsel had chosen to press the State and Company about the 553 hours. Despite the district court's stated interest in a breakdown of how the 553-hour figure was derived, very little additional information was provided in the State's restitution request or at the restitution hearing. During the hearing, the court twice asked the State and Company counsel to "help me understand" where the figure came from, but the only "help" the court received in answer to this question was a statement from the CEO that he "wished [he] would have kept better records," and a reference to a written exhibit stating that the 553 hours had been spent "reviewing printed emails, meeting with local [and federal] counsel, police investigators, and staff."

¶44 The State asserts that the record is "silent" as to what the CEO would have said, on cross-examination, and contends that Jamieson therefore cannot show prejudice. *See Scott*, 2020 UT 13, ¶¶ 38, 45–46 (holding that, where the record contained "no information about what [the] evidence would have been," the defendant could not demonstrate prejudice). But here, the record is not silent. At the preliminary hearing—which had been conducted by a magistrate, not the judge who presided over the restitution hearing—the CEO explained that the 553-hour figure was based on his assertion that "on average [he] had spent an hour a day, even now, on this matter. That's going over a two-

year period." But these figures were rough estimates—not discrete facts corroborated through other credible evidence, such as logged time sheets. While Company was under no obligation to log this information with meticulous detail, the evidence supporting the 553-hour figure, as explained at the preliminary hearing, was sketchy at best, and would likely have been fruitful ground for cross-examination. Had the CEO been cross-examined, additional information from the preliminary hearing could have been provided to the restitution judge, which information could have been used to cast additional doubt on the merits of the restitution claim.

¶45   Under the circumstances, our confidence in the outcome of the restitution hearing is undermined, and we conclude that there is a reasonable probability that the court would have reduced the number of hours if counsel had taken the opportunity to press the State and the CEO on this point.

¶46   In sum, Jamieson's trial counsel's performance was objectively deficient, and but for that deficient performance, Jamieson likely would have received a better outcome. Therefore, his trial counsel provided constitutionally ineffective assistance. *See State v. Ison*, 2004 UT App 252, ¶ 14, 96 P.3d 374 (explaining that a defendant has received constitutionally ineffective assistance of counsel when an attorney's acts "fall below the standard of reasonable professional assistance" and that "counsel's error prejudiced the defendant, i.e., that but for the error, there is a reasonable probability that the [outcome] would have been more favorable to the defendant" (quotation simplified)); *see also People v. Pangan*, 152 Cal. Rptr. 3d 632, 639 (Cal. Ct. App. 2013) (concluding that trial counsel was ineffective for failing to challenge a restitution award based on the time value of money); *State v. Hassan*, 336 P.3d 99, 105 (Wash. Ct. App. 2014) (concluding that trial counsel was ineffective for failing to object to the prosecution seeking a restitution award when "there was no evidence to support" the award and "there was no conceivable tactical reason not to object").

CONCLUSION

¶47    We agree with Jamieson that the district court plainly erred in including in its restitution order at least some amount of time spent by Company employees in addressing the criminal litigation. We also agree with Jamieson that his trial counsel was ineffective for failing to challenge the 553 hours the CEO claimed to have spent mitigating damages.

¶48    Accordingly, we vacate the restitution order and remand the case to the district court to hold a new restitution hearing and to recalculate complete restitution (and, if necessary, court-ordered restitution) in a manner consistent with this opinion.

—————