2022 UT App 95

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ERIC MATTHEW RAY,
Appellant.

Amended Opinion*
No. 20121040-CA
Filed July 29, 2022

Fourth District Court, Provo Department
The Honorable Lynn W. Davis
No. 101401511

Douglas J. Thompson, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

ORME, Judge:

¶1      On remand from our Supreme Court, Eric Matthew Ray
again challenges his conviction of forcible sexual abuse, arguing
that Utah Code section 76-5-406(2)(k) is unconstitutionally vague
on its face and that the trial court erred in denying him access to
a portion of his victim's medical records. We affirm.

---

* This amended opinion replaces the opinion issued March 31,
2022, *State v. Ray*, 2022 UT App 39, 509 P.3d 791. Footnotes 8 and
19 have been amended to discuss the law in effect at the relevant
time.

BACKGROUND[1]

¶2      In late 2008, Ray, then a married twenty-seven-year-old law student in Illinois, sent a text message to a wrong number. R.M., then a fourteen-year-old girl living in Utah, was the recipient of the misdirected text. R.M. informed Ray of his mistake and of her age, but the two began communicating daily through text, social media, and telephone conversations. They initially discussed topics such as politics, religion, school, and Ray's marital problems, but their conversations eventually took a romantic turn. R.M. testified that their "conversations got a little bit more intimate," and they began discussing sex, love, and marriage. These discussions included talk of marriage in a temple of their shared religion and of R.M. attending art school in Illinois.

¶3      In March 2010, Ray flew to Utah during his spring break to visit R.M., who by that time was fifteen years old. Over the course of Ray's four-day visit, with the exception of the third day, during which R.M. was grounded, Ray and R.M. would go to Ray's hotel room and engage in progressively serious sexual activity.

¶4      On the first day of his visit, Ray picked R.M. up from school in his rental car and took her to his hotel. There, Ray gave R.M. her "first kiss and then there was a lot of kissing and making out going on" for the next several hours. R.M. testified at trial that while lying in bed together, Ray touched her "bra and underwear areas" over her clothing. R.M. acknowledged that this contradicted her testimony at an earlier preliminary hearing, during which she stated that they had just kissed and that nothing

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Ray*, 2020 UT 12, n.2, 469 P.3d 871 (quotation simplified).

else had happened on that first day. When they had finished, Ray dropped R.M. off at a corner near her house.

¶5    On the second day, R.M.'s two friends accompanied R.M. to the hotel. While the friends went swimming at the hotel's pool, Ray and R.M. disrobed to their underwear and began "kissing on the bed" for about an hour. R.M. testified at trial that Ray again touched her "bra and [her] underwear areas" and that he also touched her buttocks and "momentarily" reached under her bra. This trial testimony also contradicted her testimony at the preliminary hearing that Ray never touched under her bra or her buttocks. R.M. testified at trial that she also touched Ray's "private parts" over his underwear, and when her friends returned to the room, the four played a game of "Sexy Truth or Dare," during which Ray showed them a picture he had taken of two sex toys.

¶6    On the third day, because R.M. was grounded due to poor grades, Ray met her in her high school parking lot, and they worked on her homework for about an hour in the rental car. R.M. testified at trial that "nothing happened" that day other than homework.

¶7    On the fourth day—their last day together—Ray decorated the hotel room with flowers and candles. R.M. took a shower and, per Ray's earlier request via text, shaved her pubic area. R.M. testified at trial that she exited the bathroom naked to find Ray also naked. They began kissing and eventually moved to the bed, where Ray touched the "outside" of R.M.'s vagina with his fingers for "[a] few minutes."[2] Afterward, they watched a movie from the *Twilight* franchise while in bed and later went out to eat. This contradicted R.M.'s testimony at the preliminary hearing that after she showered and shaved, she "[g]ot dressed and went back

---

2. R.M. testified at the preliminary hearing that Ray digitally penetrated her vagina.

into his room," where they watched the movie together and then began engaging in sexual activity.

¶8      They left the hotel room to get something to eat, and when they returned to the hotel room, the two discussed the possibility of sexual intercourse. R.M. told Ray that she "wasn't ready for that," and he said "he was okay to wait."[3] While still at the hotel, Ray gave R.M. a candle, a tee shirt he had worn, and a vibrator to remember him by. In return, R.M. gave Ray a tee shirt she had worn.

¶9      When Ray returned to Illinois, the two continued to communicate via text message for just under a week until R.M. was hospitalized with meningitis. During her ten-day hospital stay, R.M. spent some time in the ICU and was given numerous medications. R.M. stated that she was "on and off conscious" during her stay, while her mother (Mother) testified that R.M. "was awake and asleep, awake and asleep," but that she was never "unconscious."

¶10     R.M. notified Ray of her condition when she was admitted to the hospital, but she was unable to communicate with him thereafter. After unsuccessfully trying to get ahold of R.M., Ray called Mother posing as Edward Matthews, a fictional classmate of R.M.'s, and asked about her condition. Thereafter, Ray continued to contact R.M.'s parents and the hospital at least once a day inquiring after her condition and offering his own theories as to the type of infection R.M. had. At one point, he informed R.M.'s parents via email that R.M. had a vaginal infection, which Mother considered "a red flag." Concerned, Mother looked through R.M.'s social media page and found a picture containing

---

3. R.M. also testified at trial that, prior to this conversation, Ray had performed oral sex on her and that she reciprocated, but the jury did not return a unanimous verdict on two counts of forcible sodomy that correlated with this testimony.

two tags: Ray and Edward Matthews. Mother also discovered many pictures of Ray on R.M.'s cellphone. When Ray later called R.M.'s phone, her parents told him "to leave her alone."

¶11    R.M.'s parents contacted a neighbor in law enforcement, who in turn asked a detective (Detective) to look into the matter. On March 24, 2010, Detective interviewed R.M. at the hospital, whom he described at trial as being "in a sedated state" and "slow to respond." Detective also stated that R.M.'s responses quickly became "slurred," "groggy," and "incoherent." In his report, Detective wrote, "I was informed that [R.M.] had been given a dose of pain medication that made it difficult for her to speak clearly, but that she could understand what I was asking of her, and that she could answer the questions I would ask."

¶12    Although the interview lasted only about ten minutes due to R.M.'s condition, R.M. managed to confirm to Detective that Ray and Edward Matthews were the same person and to explain how they first began exchanging text messages. She told Detective that they began expressing romantic feelings toward each other and that Ray visited her in Utah earlier that month. She said that on the first day of Ray's visit, she met Ray in her high school parking lot and that "they remained there for several hours" in Ray's car. She said that they "kissed on the lips multiple times, and talked about various topics." This was at odds with R.M.'s later trial testimony that they went back to Ray's hotel room and that, in addition to kissing, Ray touched her "bra and [her] underwear areas" over her clothing.

¶13    R.M. then told Detective that she did not see Ray again until the third day. This account differed from R.M.'s later trial testimony that she and two friends went back to Ray's hotel on the second day, and that while the friends were at the pool, Ray again touched her "bra and underwear areas" and "momentarily" reached under her bra. R.M. told Detective that on the third day, they again spent time in Ray's rental car in the high school

parking lot "talking and kissing" for "three to four hours." But this time, she said that Ray also put his hands down her pants and attempted to "finger" her. Ray removed his hand after she told him to because she had a yeast infection and the rubbing was causing her pain.[4] R.M. also told Detective that she had sent Ray approximately 100 nude images of herself.[5]

¶14    At the time, R.M. did not disclose to Detective any of the additional details regarding her interactions with Ray that were later presented at trial. When Ray's counsel asked why not, R.M. responded that she "was in the hospital" and "was very sick."

¶15    Even after being discharged from the hospital, R.M. was still "extremely ill," "found it very difficult to sit" or to "communicate for long periods of time," and became nauseated "every time she moved." Based on these extenuating circumstances, and based on R.M.'s adverse reaction to Detective whenever he brought up the investigation, Detective arranged for R.M.'s adult sister (Sister) to interview her at home. During that interview, R.M. disclosed additional details that she had not

---

4. R.M.'s trial testimony that "nothing happened" in the car on that day other than homework contradicted these statements. At trial, Ray's counsel elicited testimony from R.M. that she initially told Detective that Ray had attempted to "finger" her in the car that day.

5. At trial, R.M. denied sending nude photographs of herself to Ray, and Ray's counsel elicited testimony from R.M. that an examination of her phone did not reveal any nude photographs.

disclosed in her interview at the hospital, which Sister recorded in written form.[6]

¶16    Approximately one month after the hospital interview, Detective, posing as R.M., began communicating with Ray over social media with the aim of getting "more information as to whether there had been any criminal activity." At one point, Detective asked whether Ray had told his wife about "going down my pants." Ray responded: "no I have not violated any laws so ther ewould be noting to tell."[7] At another point, Detective asked "what if I was pregnant or soemthing?" to which Ray replied, "we didnt have sex and im sure if you were pregnant, i would have found out." Detective responded, "yeah but you touched me there what if sperm was on your hand," which Ray did not deny, but instead replied, "your parents would have found a way to get me arrested." Later on in the conversation, Ray stated: "we wanted to [have sex] when we were kissing," "but you wanted to . . . stay a virgin and i didnt want to hurt you in any way and we didnt have sex." Ray later described giving R.M. her first kiss and how they then "got into bed and kissed for the rest of the day."

¶17    Eventually, Ray and "R.M." arranged for Ray to make a second visit to Utah. When Ray arrived, he was arrested.

---

6. The trial testimony is vague as to what R.M. disclosed to Sister. But Sister's written record of the interview reveals that R.M. told Sister that she visited Ray's hotel room multiple times, Ray played "Sexy Truth or Dare" with her and her two friends, he gave her a sex toy, they touched each other's genitals over their underwear, he touched her breast over her bra, they performed oral sex on each other, and he tried to "finger" her.

7. Throughout this opinion, we quote the various text messages verbatim, including typos, adding bracketed material only when necessary for clarity.

Detective subsequently interviewed Ray, during which Ray confirmed that his relationship with R.M. began as a result of him sending a text message to a wrong number. Ray further related how they began discussing religion, politics, and personal matters and how they eventually began developing feelings for each other. He also confirmed that he used the pseudonym Edward Matthews.

¶18　The State charged Ray with one count each of forcible sexual abuse and object rape, and two counts of forcible sodomy. To prove lack of consent, the State relied on Utah Code section 76-5-406(2)(k) (the enticement provision), which provides that forcible sexual abuse and other sexual offenses are without consent if "the victim is 14 years of age or older, but younger than 18 years of age, and the actor is more than three years older than the victim and entices or coerces the victim to submit or participate, under circumstances not amounting to . . . force or threat." *See* Utah Code. Ann. § 76-5-406(2)(k) (LexisNexis Supp. 2021).[8]

¶19　At a preliminary hearing, R.M. testified that she did not feel well when Detective interviewed her at the hospital and that her memory at the time was affected "just a little bit." She also stated that she "remembered better" when she spoke with Sister a few weeks later. And Detective testified that the interview did not last long because R.M. was "[i]ntoxicated" and "not very articulate"—that it was as if "her tongue wasn't working" and that "[i]t gradually got worse and worse."

¶20　Following the preliminary hearing, Ray served a supplemental discovery request on the State for R.M.'s medical

---

8. Because the applicable provisions of the Utah Code in effect at the relevant time do not materially differ from those currently in effect, except where otherwise noted, we cite the current version of the code for convenience.

records, "including a list of medications and dosage of those medications she was taking during her stay in the hospital as well as after her release." Ray stated that the information was "critical to the defense . . . because [R.M.] gave statements to the police as well as to other people (i.e. her sister) while under the influence of potentially mind and memory-altering drugs."

¶21 Approximately one month later, Mother submitted a medical record disclosure form authorizing the hospital to release R.M.'s "medications & doses" and "diagnosis" to Detective for the purpose of the "criminal investigation where [R.M.] was the victim." She did not check boxes on the form allowing for the release of, among other things, "Discharge Summary," "Consultation(s)," and "Progress notes." Mother also acknowledged on the form that she understood that the hospital "cannot guarantee that the Recipient will not redisclose [R.M.'s] health information to a third party."

¶22 The State received 22 pages of R.M.'s medical records. The State disclosed 11 of those pages, consisting of a "Medications Given Report," to Ray. The hospital apparently released the remaining pages in error. The State filed a motion under rules 14(b) and 16 of the Utah Rules of Criminal Procedure, requesting that the trial court conduct an in camera review[9] of the remaining pages for relevance and that it "determine what records, if any, the State must disclose to the defense." Ray did not object to this requested procedure.

¶23 At a hearing following the court's review of the records, the court stated that it had determined that "there wasn't anything in connection with the medical report that would be

---

9. "With origins in Latin, where 'camera' means 'chamber,' in camera review or inspection refers to a trial judge's private consideration of evidence." *State v. Betony*, 2021 UT App 15, ¶ 17 n.4, 482 P.3d 852 (quotation simplified).

relevant relative to the . . . case." When asked whether it had looked for "things that affected [R.M.'s] memory," the court replied that it "was looking for all of that." The court later issued a written order stating, "After careful review of the submitted medical records, the court finds no relevancy of these records to this case" and that "in providing defense counsel with copies of the 'Medications Given Report,'" the State "has complied strictly and thoroughly with the defendant's discovery request."

¶24 Prior to trial, Ray filed two motions to dismiss. One motion argued that the enticement provision was unconstitutionally vague because the term "entice" was not sufficiently defined to give Ray notice that his conduct constituted enticement. The other motion argued that "the State failed to present sufficient evidence at the preliminary hearing . . . to establish probable cause." Specifically, he contended that "[t]he State's evidence presented at the preliminary hearing failed to establish probable cause [that he] enticed or coerced R.M. to engage in any sexual conduct without her consent."

¶25 The trial court denied both motions. It concluded that the enticement provision was not unconstitutionally vague "[b]ecause the words used to describe a proscribed conduct are both commonly used and clearly defined" by caselaw.

¶26 Turning next to Ray's sufficiency-of-the-evidence argument, the court found evidence that Ray "use[d] religious principles to foster a sexual relationship" with R.M. by promising her that "he would 'take her to the temple, marry her.'" The court continued that "[i]n the mind of an impressionable young girl, it's probable that this promise would create a veneer of wholesomeness and goodness on a relationship which is manifestly abhorrent." And "[b]y manipulating [R.M.'s] religious beliefs, [Ray] likely was able to get [her] to act sexually in ways she might not otherwise act." The court also found evidence that Ray "spent 18 months plus cultivating the relationship" and

"groomed [R.M.] by saturating himself into her life" with "texting, instant messaging, [and] speaking by video." There was also evidence that Ray "used teen pop culture to manipulate" R.M. by donning the pseudonym Edward Matthews "as a reference to the popular *Twilight* series, [implicating] the series's theme of forbidden love and desire and danger, etc." Based on this, the court concluded that the State presented sufficient evidence to establish probable cause that Ray enticed R.M.

¶27 The case then proceeded to trial, following which the jury convicted Ray on the forcible sexual abuse charge but acquitted him on the object rape charge and could not reach a unanimous verdict on either forcible sodomy charge. Ray appealed his conviction to this court, raising several issues. While the appeal was then pending, this court granted Ray's motion for a rule 23B remand, during which an expert witness for the defense reviewed all 22 pages of R.M.'s medical records. *See generally* Utah R. App. P. 23B.

¶28 In our prior opinion in this case, *State v. Ray (Ray I)*, 2017 UT App 78, 397 P.3d 817, *rev'd*, 2020 UT 12, 469 P.3d 871, we held that Ray's trial counsel provided constitutionally ineffective assistance for failing to request a jury instruction defining the term "indecent liberties" under Utah Code section 76-5-404(1). *See* 2017 UT App 78, ¶¶ 17–23. We vacated Ray's conviction and remanded for a new trial on that basis. *See id.* ¶ 28. With the exception of Ray's argument that we should simply reverse his conviction because R.M.'s testimony was inherently improbable, which argument we rejected, *see id.* ¶ 27, we did not have occasion to address the remaining arguments Ray raised on appeal in view of our decision to vacate his conviction and remand for a new trial.

¶29 Our Supreme Court granted certiorari and issued *State v. Ray (Ray II)*, 2020 UT 12, 469 P.3d 871, in which it concluded that Ray's trial counsel had not performed deficiently in not

requesting an instruction on "indecent liberties." *See id.* ¶¶ 25, 45. In so doing, the Court clarified, among other things, that the standard for the deficient performance prong of the ineffective assistance of counsel inquiry "is not whether counsel's course of conduct was strategic, but whether it fell below an objective standard of reasonableness." *Id.* ¶ 33. The Court then reversed our decision in *Ray I*, reinstated Ray's conviction, and remanded for us "to address Ray's remaining claims." *Id.* ¶ 46.

¶30 Following remand to this court, Ray filed a stipulated motion to allow replacement briefs on the ground that "[n]early five years ha[ve] passed since Ray's opening brief was filed, that includes five years of new cases potentially relevant to, persuasive toward, or even binding upon the remaining briefed issues." We granted this motion and later, upon Ray's request, clarified that based on our Supreme Court's mandate "to address Ray's remaining claims," *id.*, the replacement briefs were to be limited to "the claims that were initially raised by Ray on appeal but that were not addressed by this court in its prior opinion."

ISSUES AND STANDARDS OF REVIEW

¶31 Ray first argues that the trial court incorrectly ruled that the enticement provision was not unconstitutionally vague.[10]

---

10. Ray raises two additional constitutional challenges to the enticement provision. First, he argues that the enticement provision is unconstitutional as applied to him because it criminalized his fundamental rights under the Due Process Clause and violated the First Amendment. In his view, "R.M. could legally consent to sexual conduct" and could marry "if voluntarily and with premarital counseling." In that context, he asserts that "[i]ntimate relationships involved in creating a family are a fundamental element of personal liberty" and that "adults

(continued…)

"Whether a statute is unconstitutionally . . . vague is a question of law reviewed for correctness." *State v. Jones*, 2020 UT App 31, ¶ 27, 462 P.3d 372 (quotation simplified). The party challenging a statute "as unconstitutional bear[s] the burden of demonstrating its unconstitutionality." *State v. Jones*, 2018 UT App 110, ¶ 9, 427 P.3d 538 (quotation simplified). Furthermore, "[a] statute is presumed constitutional, and we resolve any reasonable doubts in favor of constitutionality." *State v. Mattinson*, 2007 UT 7, ¶ 6, 152 P.3d 300.

¶32    Next, Ray argues that the trial court erred in denying him access to the remaining eleven pages of R.M.'s medical records. "We review a trial court's denial of a discovery motion for abuse of discretion."[11] *State v. Santonio*, 2011 UT App 385, ¶ 12, 265 P.3d 822. Additionally, "we will reverse only if a reasonable likelihood exists that absent the error, the result would have been more favorable to the defendant." *State v. Leech*, 2020 UT App 116, ¶ 31, 473 P.3d 218 (quotation simplified). *See* Utah R. Crim. P. 30(a).

---

have First Amendment rights to sexual expression," both of which the enticement provision unconstitutionally criminalized in his case. Second, Ray argues that the enticement provision is unconstitutionally overbroad. On remand, we are limited by our Supreme Court's mandate "to address Ray's remaining claims." *Ray II*, 2020 UT 12, ¶ 46, 469 P.3d 871. Because Ray did not raise these issues in his original brief, we have no occasion to address them here.

11. The State asserts that this issue is not preserved. Because we resolve the merits of the claim in the State's favor, we need not address this preservation argument. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("If the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation.") (quotation simplified).

ANALYSIS

I. Vagueness Challenge

¶33 The enticement provision states that various sexual offenses, including forcible sexual abuse, are without consent if "the victim is 14 years of age or older, but younger than 18 years of age, and the actor is more than three years older than the victim and *entices* or coerces the victim to submit or participate, under circumstances not amounting to . . . force or threat." Utah Code Ann. § 76-5-406(2)(k) (LexisNexis Supp. 2021) (emphasis added). The purpose of the enticement provision, "in combination with the statutory section defining the crime, is to prevent mature adults from preying on younger and inexperienced persons." *State v. Gibson*, 908 P.2d 352, 356 (Utah Ct. App. 1995) (quotation simplified). It "protect[s] young persons from sexual exploitation by older, more experienced persons until they reach the legal age of consent and can more maturely comprehend and appreciate the consequences of their sexual acts." *State v. Scieszka*, 897 P.2d 1224, 1227 (Utah Ct. App. 1995) (quotation simplified). Ray argues that the enticement provision is unconstitutionally vague on its face.[12]

---

12. Ray also, at least nominally, raises an as-applied vagueness challenge to the enticement provision, which requires him to establish "that the statute was applied to him . . . in an unconstitutional manner." *State v. Herrera*, 1999 UT 64, ¶ 4 n.2, 993 P.2d 854. Although Ray raised an as-applied argument in his original brief to this court, he argues in his replacement brief, under the as-applied heading, that the enticement provision is overbroad and subject to strict scrutiny because it infringes on his First Amendment rights to freedom of speech and association and on his fundamental rights to marriage and procreation. As previously discussed, *see supra* note 10, because Ray did not raise

(continued…)

¶34 "A statute may be unconstitutional either on its face or as applied to the facts of a given case." *State v. Herrera*, 1999 UT 64, ¶ 4 n.2, 993 P.2d 854. A facial challenge is the most difficult of the two "because it requires the challenger to establish that no set of circumstances exists under which the statute would be valid."[13] *Id.* (quotation simplified). *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Furthermore, facial vagueness challenges to a statute are appropriate only if First Amendment rights or other constitutionally protected conduct are implicated.[14] *See State v.*

---

these other constitutional issues in his original brief, we have no occasion to address them on remand.

13. Ray argues that because "[t]his is a First Amendment case, some valid applications cannot save [the enticement provision] as [his] speech was not clearly proscribed." Although Ray correctly states that an exception to this general rule arises in the First Amendment context, it does so in the form of an overbreadth challenge. *See United States v. Salerno*, 481 U.S. 739, 745 (1987); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) ("[A] Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression."); *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("There are two main ways to succeed on a facial challenge in the First Amendment context. A plaintiff may demonstrate either that no set of circumstances exists under which the law would be valid, i.e., that the law is unconstitutional in all of its applications, or that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the law's plainly legitimate sweep.") (quotation simplified). The exception therefore does not apply to Ray's vagueness challenge.

14. Additionally, "when a party raises both facial and as-applied vagueness challenges, '[a] court should . . . examine the complainant's conduct before analyzing other hypothetical

(continued…)

*Green*, 2004 UT 76, ¶ 44, 99 P.3d 820 (stating that "'[vagueness] challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand'") (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982)). *See also United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988) (stating that an appellant may raise a facial vagueness challenge only (1) "when it threatens to chill constitutionally protected conduct, especially conduct protected by the First Amendment"; or (2) "in some instances . . . on pre-enforcement review") (footnote omitted).

¶35    Here, the State argued at trial that Ray enticed R.M. by "play[ing] right into" the tendency of teenage girls to "fall[] in love with fantasy" and "playing into [R.M.'s] young, . . . 15-year-old mind" through, among other things, the cultivation of an 18-month relationship, the "constant barrage of IMs and

---

applications of the law.'" *State v. Pence*, 2018 UT App 198, ¶ 19, 437 P.3d 475 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95 (1982)). This is because "a defendant 'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *State v. Jones*, 2018 UT App 110, ¶ 16, 427 P.3d 538 (quoting *Village of Hoffman*, 455 U.S. at 495). And because "a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression," this "rule makes no exception for conduct in the form of speech." *Holder*, 561 U.S. at 20. Thus, "[u]nder this rule, a 'court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.'" *Lehi City v. Rickabaugh*, 2021 UT App 36, ¶ 40, 487 P.3d 453 (quoting *Village of Hoffman*, 455 U.S. at 495).

   Here, because we address only Ray's facial challenge to the enticement provision, we do so without first addressing Ray's conduct.

texting," discussing politics and religion, "[t]alking about . . . infatuation," making long term plans, and discussing temple marriage. Because this conduct implicates the First Amendment right to free speech and of association, we may proceed to address Ray's facial vagueness challenge.[15]

¶36    "Vagueness questions are essentially procedural due process issues, i.e., whether the statute adequately notices the proscribed conduct." *State v. MacGuire*, 2004 UT 4, ¶ 14, 84 P.3d 1171 (quotation simplified). *See State v. Davie*, 2011 UT App 380, ¶ 14, 264 P.3d 770 ("[T]he vagueness doctrine is rooted in the Due Process Clauses of the Fifth and Fourteenth Amendments."). "A statute is impermissibly vague if it either (a) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (b) 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *State v. Ansari*, 2004 UT App 326, ¶ 42, 100 P.3d 231 (quoting *Hill v. Colorado*, 530 U.S. 703, 732–33 (2000)). A statute is not unconstitutionally vague so long as it "is sufficiently explicit to inform the ordinary reader what conduct is prohibited." *MacGuire*, 2004 UT 4, ¶ 14 (quotation simplified). *Cf. id.* ¶ 32 ("[B]ecause the meaning of the term is readily ascertainable, its inclusion does not encourage or facilitate arbitrary and discriminatory enforcement.").

---

15. Our Supreme Court has held that "soliciting, seducing, luring, or enticing a known minor to actually engage in unlawful sexual activity . . . is not afforded First Amendment protections." *State v. Gallegos*, 2009 UT 42, ¶ 19, 220 P.3d 136 (quotation simplified), *abrogated on other grounds by Miller v. Utah Dep't of Transp.*, 2012 UT 54, 285 P.3d 1208. Nevertheless, the First Amendment is still implicated here because we must determine whether the enticement provision gave sufficient notice of what constitutes prohibited conduct or speech.

¶37 "The determination whether a criminal statute provides fair warning of its prohibitions must be made on the basis of the statute itself and other pertinent law[.]" *Bouie v. City of Columbia*, 378 U.S. 347, 355 n.5 (1964). *See United States v. Williams*, 553 U.S. 285, 306 (2008) (stating that terms found to be void for vagueness lack "statutory definitions, narrowing context, or settled legal meanings"). Additionally, the constitutionality of a law may not be called into doubt simply on the basis that it "call[s] for the application of a qualitative standard." *Johnson v. United States*, 576 U.S. 591, 603–04 (2015). But "the failure of persistent efforts to establish a standard can provide evidence of vagueness." *Id.* at 598 (quotation simplified). In the case before us, based on the plain language of the enticement provision and relevant caselaw, we hold that the enticement provision is not unconstitutionally vague on its face.

¶38 Although our Legislature did not define the term "entice" as used in the enticement provision, it is a word that is both "commonly used and clearly defined." *State v. Gallegos*, 2009 UT 42, ¶ 16, 220 P.3d 136 (discussing "entice" and other terms in the context of Utah Code section 76-4-401), *abrogated on other grounds by Miller v. Utah Dep't of Transp.*, 2012 UT 54, 285 P.3d 1208. *See United States v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007) (stating, in the context of 18 U.S.C. § 2422(b), that certain words, including "entice," "though not defined in the statute, are words of common usage that have plain and ordinary meanings"); *United States v. Dhingra*, 371 F.3d 557, 562 (9th Cir. 2004) (same). "In fact, '[t]he likelihood that anyone would not understand'" such a common term "'seems quite remote.'" *Gallegos*, 2009 UT 42, ¶ 16 (alteration in original) (quoting *Hill*, 530 U.S. at 732). And a defendant "cannot simply inject doubt as to the meaning of words where no doubt would be felt by the normal reader." *Id.* (quotation simplified).

¶39 Utah courts have previously relied on dictionary definitions to define "entice" when addressing the enticement

provision. In *State v. Gibson*, 908 P.2d 352 (Utah Ct. App. 1995), this court noted that "Black's Law Dictionary defines 'entice' as 'to wrongfully solicit, persuade, procure, allure, attract, draw by blandishment, coax or seduce'" and "'[t]o lure, induce, tempt, incite, or persuade a person to do a thing.'" *Id.* at 356 (quoting *Entice*, Black's Law Dictionary 531 (6th ed. 1990)). *See State v. Scieszka*, 897 P.2d 1224, 1226 (Utah Ct. App. 1995) (referencing Black's Law Dictionary and Webster's New 20th Century Dictionary definitions of "entice"). And in *State v. Billingsley*, 2013 UT 17, 311 P.3d 995, our Supreme Court similarly noted that "*Black's Law Dictionary* defines 'entice' as '[t]o lure or induce; esp., to wrongfully solicit (a person) to do something,'" *id.* ¶ 13 (quoting *Entice*, Black's Law Dictionary 611 (9th ed. 2009)), and that "*Webster's Third New International Dictionary* defines it as 'to draw on by arousing hope or desire,'" *id.* (quoting *Entice*, Webster's Third New Int'l Dictionary 757 (1961)).

¶40 Based on the dictionary definitions, this court has held that under the enticement provision, "the 'enticement' of a teenager by an adult occurs when the adult uses psychological manipulation to instill improper sexual desires which would not otherwise have occurred." *Gibson*, 908 P.2d at 356. *See id.* at 356 n.3 (noting that "[o]ther courts have defined 'entice' similarly"). And later, our Supreme Court clarified that the "inquiry under the statute should focus on the defendant's conduct, not the victim's sexual experience." *Billingsley*, 2013 UT 17, ¶ 13. Utah courts have further observed that the determination of whether a defendant's conduct amounts to enticement is based on "the totality of the facts and circumstances." *Gibson*, 908 P.2d at 356. *Accord Scieszka*, 897 P.2d at 1227. And borrowing from caselaw on the "similar issue" of "indecent liberties," Utah courts have suggested that relevant factors in such an inquiry may include

> (1) the nature of the victim's participation (whether the defendant required the victim's active participation), (2) the duration of the defendant's

> acts, (3) the defendant's willingness to terminate his conduct at the victim's request, (4) the relationship between the victim and the defendant, and (5) the age of the victim.

*Scieszka*, 897 P.2d at 1227 (quotation simplified). *Accord Gibson*, 908 P.2d at 356.

¶41    Additionally, in *Gallegos*, our Supreme Court rejected a vagueness challenge to another statute's use of "entice." *See* 2009 UT 42, ¶¶ 21–22. The statute in question provided that "a person is guilty of enticing a minor over the internet if he or she 'knowingly uses a computer to solicit, seduce, lure, or *entice* . . . a minor or a person the defendant believes to be a minor to engage in sexual activity which is a violation of state law.'" *Id.* ¶ 16 (quoting Utah Code Ann. § 76-4-401 (LexisNexis 2008)) (emphasis added). The Court held that the statute in question was not unconstitutionally vague because "the words used to describe the proscribed conduct"—including "entice"—"are both commonly used and clearly defined," and because "the likelihood that anyone would not understand any of these common words seems quite remote." *Id.* (quotation simplified). We conclude that the same applies to our Legislature's use of "entice" in the enticement provision context. Additionally, "because the meaning of the term is readily ascertainable, its inclusion does not encourage or facilitate arbitrary and discriminatory enforcement." *State v. MacGuire*, 2004 UT 4, ¶ 32, 84 P.3d 1171.

¶42    Ray contends that *Gallegos* is distinguishable because our Supreme Court also noted that "any concern about lack of notice is ameliorated by the fact that [Utah Code section 76-4-401] contains a scienter requirement, i.e., that the person must 'knowingly' solicit a minor," 2009 UT 42, ¶ 16 n.1 (quotation simplified), and because the statute at issue in that case "prohibits an individual from 'solicit[ing], seduc[ing], lur[ing], or entic[ing]' a known minor to actually *engage* in unlawful sexual activity," *id.*

¶ 19 (quoting Utah Code Ann. § 76-4-401(2)(b)(ii)) (emphasis in original). Ray asserts that unlike Utah Code section 76-4-401, the enticement provision (1) contains no such scienter requirement and (2) does not "require[] enticement to engage in illegal sex." We disagree that these observations render *Gallegos* inapplicable.

¶43    First, the Utah Criminal Code provides that "when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability"—as is the case with both Utah Code section 76-5-404's definition of forcible sexual abuse and with the enticement provision—"intent, knowledge, or recklessness shall suffice to establish criminal responsibility." Utah Code Ann. § 76-2-102 (LexisNexis 2018). *See State v. Barela*, 2015 UT 22, ¶ 26, 349 P.3d 676 (requiring mens rea for the non-consent element of a sex crime). Accordingly, by virtue of Utah Code section 76-2-102, the enticement provision has a scienter provision.

¶44    And in any event, although the United States Supreme Court has stated that "a scienter requirement may mitigate a law's vagueness," *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982), it "has never suggested that the absence of a mens rea requirement, by itself, renders a statute unconstitutional," *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 973 (9th Cir. 2003). *See Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Karlin v. Foust*, 188 F.3d 446, 463 (7th Cir. 1999). And in *Gallegos*, our Supreme Court did not hold that the statute in that case would be unconstitutionally vague but for its scienter requirement. *See* 2009 UT 42, ¶¶ 16–22. Instead, in addressing the first prong of the vagueness test—that the statute "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," *id.* ¶ 15 (quotation simplified)—the Court focused its analysis on the plain meaning of the words of the statute and rejected the appellant's argument on that basis, *see id.* ¶¶ 16–17. The Court merely added in a footnote that "moreover, any concern about lack of notice is

ameliorated by the fact that the [statute] contains a scienter requirement." *Id.* ¶ 16 n.1 (quotation simplified).

¶45 Second, turning to Ray's assertions that *Gallegos* is distinguishable from the present case on the ground that the enticement provision does not require "enticement to engage in illegal sex," Ray does not elaborate on this argument other than to reiterate that "underlying crimes are absent" in the enticement provision. This argument misses the point. Utah Code section 76-5-406 lists several unlawful sexual offenses that are committed when there is lack of consent—including the offense of forcible sexual abuse of which Ray was convicted. *See* Utah Code Ann. § 76-5-406(2) (LexisNexis Supp. 2021); *id.* § 76-5-404(1) (defining forcible sexual abuse). The section then provides several circumstances, including the one contained in the enticement provision, under which the victim is not considered to have given consent. *See id.* § 76-5-406(2). Thus, if a defendant engages in sexual activity with a victim without the victim's consent, it is clear that the non-consensual sexual activity constitutes "illegal sex," the specific charge of which, depending on the facts of the case, is listed in section 76-5-401(2) and defined in greater detail elsewhere in the Utah Criminal Code. *See generally id.* §§ 76-5-401 to -416 (2017 & Supp. 2021).

¶46 Lastly, Ray asserts that the enticement provision is unconstitutionally vague because each time it "is before the court, a new test is invented," thereby rendering enticement "undefinable." *See Johnson v. United States*, 576 U.S. 591, 598 (2015) ("The failure of persistent efforts to establish a standard can provide evidence of vagueness.") (quotation simplified). He first points to our Supreme Court's holding in *State v. Billingsley*, 2013 UT 17, 311 P.3d 995, that an enticement inquiry should focus on the defendant's conduct and not the victim's sexual experience, *see id.* ¶¶ 14–15, and a seemingly contradictory footnote in the concurring opinion stating that "sexual innocence, while certainly relevant, is not essential to the question of enticement," *id.* ¶ 27

n.2 (Lee, J., concurring in part). He also points to *State v. Gibson*, 908 P.2d 352 (Utah Ct. App. 1995), in which this court discussed the dictionary definitions of "entice," *see id.* at 356; cited the definitions of "entice" employed by Wisconsin and South Dakota courts in a similar context,[16] *see id.* at 356 n.3; and discussed and applied five factors relevant in the "totality of the facts and circumstances" inquiry, *see id.* at 356–57. Ray asserts that these references "all use 'entice' differently." Lastly, Ray references the concurring opinion in *Gibson*, which stated that in *Scieszka* "we seemed to assume that 'entice,' as used in the statute, required a pattern of ongoing, systematic, purposeful conduct with at least an implicit offer of some kind of reward," but "we have, in essence, equated the word entice, as used in the statute, to include any situation in which the adult participant takes the lead in bringing about the sexual encounter complained of." *Id.* at 357 (Orme, J., concurring).

¶47 We disagree with Ray's characterization of the relevant caselaw. Although the enticement inquiry has certainly developed over time, our caselaw falls short of "repeated attempts and repeated failures to craft a principled and objective standard," which the United State Supreme Court indicated may evidence a statute's vagueness. *Johnson*, 576 U.S. at 598. In *Johnson*, the Supreme Court invalidated the residual clause of the Armed Career Criminal Act of 1984 as unconstitutionally vague. *Id.* at 606. As evidence of vagueness, the Court noted that each time it addressed the residual clause, it "found it necessary to resort to a different ad hoc test to guide [its] inquiry." *Id.* at 598. The Court also pointed to the "pervasive disagreement" among the lower federal courts "about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider"

---

16. This court in *Gibson* cited the definitions from other jurisdictions in the context of noting that "[o]ther courts have defined 'entice' similarly." 908 P.2d at 356 n.3.

when determining "whether the residual clause covers this or that crime." *Id.* at 601.

¶48   Unlike with the provision at issue in *Johnson*, although adjustments and clarifications have been made to Utah's enticement inquiry over time, the standard has never been overturned and replaced. Indeed, the qualitative nature of the inquiry prevents it from being entirely resistant to adjustment with each new set of facts. In pointing to the relevant factors Utah courts have considered in determining whether a defendant engaged in enticement, Ray seems to argue that the enticement provision is unconstitutionally vague based on the qualitative nature of the totality of circumstances inquiry. But this, on its own, is insufficient to render a statute vague. *See id.* at 603–04. To the contrary, "the law is full of instances where a man's fate depends on his estimating rightly some matter of degree." *Id.* at 604 (quotation simplified).

¶49   For the foregoing reasons, we hold that the enticement statute is not unconstitutionally vague on its face.

## II. Sealed Medical Records

¶50   Ray argues that the trial court erred in denying him access to the remaining eleven pages of R.M.'s medical records. Among other things, he argues that the court should have ordered the disclosure of the sealed records under rule 16(a) of the Utah Rules of Criminal Procedure, that the court misapplied rule 14 of the Utah Rules of Criminal Procedure, and that Mother waived any privilege in the records when she signed the medical record disclosure form.[17] But even assuming, without deciding, that the

---

17. Ray also argues that by withholding the remaining medical records, the State violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), "to disclose material, exculpatory evidence to

(continued…)

court erred in denying Ray access to the remaining eleven pages, such error is harmless and does not warrant reversal.

---

the defense in criminal cases." *State v. Bisner*, 2001 UT 99, ¶ 32, 37 P.3d 1073 (quotation simplified). *See Brady*, 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). The State argues that because Ray did not raise this issue in his original brief, it falls outside our Supreme Court's mandate on remand. Ray counters that "although the *Brady* argument is a new argument, and is supported by cases not previously cited, it is not a distinct claim." But because we conclude that any error in withholding the eleven additional pages was harmless, we need not resolve this question.

More specifically, because Ray's *Brady* argument is unpreserved, he asks us to review it for plain error. This requires him to "establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (quotation simplified). Under the third prong, for an error to be harmful, it "must be shown to have been of such a magnitude that there is a reasonable likelihood of a more favorable outcome for the defendant." *Id.* ¶ 21 (quotation simplified). In other words, there must be "a reasonable probability that, but for the alleged error, the outcome in the case would have been different." *Id.* (quotation simplified). This standard mirrors the harmless error doctrine, under which "we will reverse only if a reasonable likelihood exists that absent the error, the result would have been more favorable to the defendant." *State v. Leech*, 2020 UT App 116, ¶ 31, 473 P.3d 218 (quotation simplified). *See* Utah R. Crim. P. 30(a). Because we conclude that any error in denying Ray's motion to disclose the additional medical records was harmless, it follows that the *Brady* claim will likewise not pass muster under plain error review.

¶51　"Not every trial error requires reversal." *State v. Leech*, 2020 UT App 116, ¶ 42, 473 P.3d 218 (quotation simplified). Under the harmless error doctrine, "an error is harmless and does not require reversal if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." *State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712 (quotation simplified). *See* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). In other words, "the likelihood of a different outcome absent the error must be sufficiently high to undermine confidence in the verdict." *Reece*, 2015 UT 45, ¶ 33 (quotation simplified). Here, we are not convinced that, had Ray been given access to the 11 additional pages of R.M.'s medical records, there is a reasonable likelihood he would have obtained a more favorable result at trial.

¶52　Ray asserts that "[t]his case rests entirely upon R.M.'s credibility, and in turn, the State's excuses for her inability to tell the same story twice." At trial, Ray's strategy "was to show that R.M. was not telling the truth by showing inconsistencies in her various interviews, her preliminary hearing testimony, and her trial testimony." Accordingly, Ray contends that the sealed pages were "crucial to . . . attacking R.M.'s credibility" and were "favorable to show that R.M. and [Detective] were willing to lie or seriously exaggerate under oath." Specifically, R.M. stated at trial that she was "on and off conscious" during her hospital stay. And Detective at trial described R.M. as being "in a sedated state" and "slow to respond" during the hospital interview. Detective also stated that the interview did not last long because R.M.'s responses quickly became "slurred," "groggy," and "incoherent."

¶53    To counter these descriptions, Ray points to sections of the sealed records[18] and asserts that they "prove R.M. was not incapable of communicating, was not unconscious or comatose, was not intoxicated, and was not suffering from memory loss" at the time Detective interviewed her at the hospital. Based on this, Ray contends that, had he been given access to the records, "he would have prevented R.M. and [Detective] from covering up her inconsistencies with patently false statements." Specifically, Ray's expert witness testified at the rule 23B hearing that "[n]othing in the sealed records indicates that R.M. had a fever while hospitalized or that she had trouble communicating during her stay, that she was ever comatose, or that she had any problems with her memory," and that "[i]f R.M. had become comatose or unable to communicate during her stay, [the expert witness] would have expected that information to be included in the sealed records." The expert witness also pointed to an instance in the medical records that described R.M. as responsive to an exam despite being "quite sedated" from certain medications and another instance that indicated that she was "alert and oriented" during a different exam. And the expert noted R.M.'s discharge summary that stated "R.M.'s 'behavior was at times inconsistent and suggestive of exaggerated symptoms.'"

¶54    But the expert also acknowledged that the sealed records do "not represent the entire hospital record," "which would also include daily progress notes from the physician and a large volume of data generated by nurses, laboratory results, and CT scans." The records are silent as to R.M.'s condition at the time Detective interviewed her on March 24. Indeed, our review of the

---

18. Because the medical records in question remain sealed, we rely on the expert witness's testimony at the rule 23B hearing, which is not sealed, for our discussion of the records. We have reviewed the sealed records and have determined that they are consistent with that testimony.

sealed records indicates that the interview took place squarely in the middle of an eight-day period in which the records do not specifically reference R.M.'s condition. And the medical records containing the "Medications Given Report," to which Ray was given access prior to trial, indicate that within a 24-hour period of the interview, R.M. was given several medications that the expert witness acknowledged can have a sedative effect and can cause "dizziness," "drowsiness," or "confusion." Two of the medications given to R.M. at that time were the same medications that caused her to be "quite sedated" for an earlier medical exam. This is consistent with Detective's report, in which he indicated, "I was informed that [R.M.] had been given a dose of pain medication that made it difficult for her to speak clearly, but that she could understand what I was asking of her, and that she could answer the questions I would ask."

¶55   Next, although the expert witness pointed to a note in R.M.'s discharge summary that "R.M.'s 'behavior was, at times, inconsistent and suggestive of exaggerated symptoms,'" he conceded that the sealed records do not indicate that R.M. "had trouble communicating during her stay, that she was ever comatose, or that she had any problems with her memory." Thus, this statement does not support the proposition that R.M. had pervasive exaggerated memory or communication problems. Furthermore, the aforementioned note in the records indicating that R.M. became "quite sedated"—although still responsive— from certain medications was made the day R.M. was admitted to the hospital, which was before her parents discovered her relationship with Ray. R.M. therefore would not have had any relevant reason to exaggerate her reaction to those medications at that time. And to the extent the sealed medical records contradict R.M.'s trial testimony that she was "on and off conscious" during her hospital stay, the jury had already heard Mother testify that R.M. "was awake and asleep, awake and asleep," but never "unconscious" during that time.

¶56 And even assuming that the inconsistencies between R.M.'s initial interview and her trial testimony were completely excused by her medical condition, there were also several significant inconsistencies between R.M.'s preliminary hearing testimony and her trial testimony, for which R.M. offered no explanation other than to state that she was "less afraid" at the time of trial. For example,

- At the preliminary hearing, R.M. said that she and Ray had just kissed on the first day, but at trial she said that Ray had also touched her "bra and [her] underwear areas" over her clothing.

- At the preliminary hearing, R.M. stated that Ray never reached under her bra, but at trial she said that he "momentarily" reached under her bra on the second day.

- At the preliminary hearing, R.M. said that Ray did not touch her buttocks on the second day, but at trial she said that he had.

- At the preliminary hearing, R.M. said that after she had showered and shaved on the fourth day, she "[g]ot dressed and went back into [Ray's] room," where they watched a movie together in bed. But at trial, she said that they were undressed, began kissing, and eventually moved to the bed, where Ray touched the "outside" of her vagina with his fingers for "[a] few minutes."

- At the preliminary hearing, R.M. stated that Ray inserted his fingers into her vagina, but at trial she stated that he touched the "outside" of her vagina with his fingers.

- At the preliminary hearing, R.M. repeatedly denied performing oral sex on Ray, but at trial she stated that she did.

All these substantial, unexplained inconsistencies—many of which Ray highlighted at trial—produced strong impeachment evidence on their own. We are not persuaded that it is reasonably likely that the additional incremental impeachment evidence arguably to be gleaned from the remaining medical records would have made a difference.

¶57   Finally, Ray's own admissions corroborated much of R.M.'s account regarding their relationship and her testimony regarding touching that amounted to forcible sexual abuse.[19]

---

19. Utah Code section 76-5-404 provides that

> [a]n individual commits forcible sexual abuse if the victim is 14 years of age or older and, under circumstances not amounting to rape, object rape, forcible sodomy, or attempted rape or forcible sodomy, the actor touches the anus, buttocks, pubic area, or any part of the genitals of another, or touches the breast of a female, or otherwise takes indecent liberties with another, with intent to cause substantial emotional or bodily pain to any individual or with the intent to arouse or gratify the sexual desire of any individual, without the consent of the other, regardless of the sex of any participant.

Utah Code Ann. § 76-5-404(1) (LexisNexis Supp. 2021). "Accordingly, the forcible sexual abuse statute establishes two variants of the offense." *Ray II*, 2020 UT 12, ¶ 26, 469 P.3d 871. "The first variant relates to the touching of specific areas of another's body (touching variant)" and "the second variant is more general and establishes that otherwise taking indecent liberties with another constitutes forcible sexual abuse (indecent liberties variant)." *Id.* (quotation simplified).

   Although the text of this statute as currently in effect is substantially similar to the version in effect in March 2010, *compare* Utah Code Ann. § 76-5-404(1) (Supp. 2021), *with id.* (2008), there is

(continued…)

Among other things, in his police interview and in the messages Ray exchanged with Detective posing as R.M., Ray corroborated R.M.'s account about how their relationship began and progressed; that he gave R.M. her first kiss; that they played "Sexy Truth or Dare" with two of R.M.'s friends; and that on the last day, Ray decorated the hotel room with candles and flowers. More

---

one significant difference: in the version in effect in 2010, over-the-clothes touching did not satisfy the touching variant of forcible sexual abuse. Specifically, Utah Code section 76-5-407 listed three sexual offenses for which "any touching, even if accomplished through clothing, is sufficient to constitute the relevant element of the offense." *See id.* § 76-5-407(3) (2008). Those offenses are sodomy on a child, sexual abuse of a child, and aggravated sexual abuse of a child. *See id*. § 76-5-407(3)(a)–(b). Because section 76-5-407 excluded forcible sexual abuse from this list, this court held that over-the-clothes touching did not satisfy the touching variant. *See State v. Jacobs*, 2006 UT App 356, ¶¶ 6–9, 144 P.3d 226. However, this court held that "even when the specified body parts are touched through clothing, the perpetrator may still be punished under the indecent liberties [variant] of the statute when, considering all the surrounding circumstances, the conduct is comparable to the touching that is specifically prohibited." *Id.* ¶ 9. Based on this, R.M.'s trial testimony provided sufficient evidence of forcible sexual abuse, of both the touching and indecent liberties variants. And as discussed above, we are not convinced that, had Ray been given access to the 11 additional pages of R.M.'s medical records, there is a reasonable likelihood he would have obtained a more favorable result at trial.

In 2019, our Legislature amended section 76-5-407 to add forcible sexual abuse to the list of offenses where touching over the clothing is enough, *see* Utah Code Ann. § 76-5-407(3)(e) (Supp. 2019), and has since moved the over-the-clothing provision to section 76-5-404 itself, *see* 2022 Utah Laws Ch. 181 § 87 (codified at Utah Code section 76-5-404(2)(b)).

notably, when "R.M." asked whether Ray had told his wife about "going down [R.M.'s] pants," Ray did not deny the assertion. Instead, he texted, "no I have not violated any laws so there would be noting to tell." And at another point, when "R.M." asked if she could be pregnant because "you touched me there what if sperm was on your hand" Ray again did not deny touching R.M. "there," instead replying that if she was pregnant, R.M.'s "parents would have found a way to get [him] arrested."

¶58    In sum, we are not convinced that it is reasonably likely that Ray would have obtained a more favorable outcome at trial if he had obtained access to the remaining medical records. For this reason, even if there was error on the trial court's part, such error was harmless and does not warrant reversal.

## CONCLUSION

¶59    The enticement provision is not unconstitutionally vague on its face, and any error in withholding R.M.'s remaining medical records was harmless. Accordingly, Ray's conviction is affirmed.

—————